57 Wn.2d 565 (1961)
358 P.2d 801
In the Matter of the Estate of MARY A. MALLOY, Deceased.
FRED J. SCHNEIDER et al., Appellants,
v.
MAY CAMPBELL, et al., Respondents.[1]
No. 35404.
The Supreme Court of Washington, Department Two.
January 19, 1961.
Joseph T. Pemberton, for appellants.
William A. Gardiner and Abbott, Lant, & Fleeson, for respondents.
ROSELLINI, J.
This is a will contest. The action, brought by collateral heirs of the testatrix, resulted in a decision upholding the will.
Mary A. Malloy died on May 8, 1957, at the age of ninetythree. Her last will was executed February 8, 1956, and a codicil thereto was executed September 6, 1956. Both instruments were drawn by a Bellingham attorney. The will contained bequests of one hundred dollars to each of named nephews and nieces, among whom were the petitioners in this action, a five-hundred-dollar bequest to the Whatcom County Orthopedic Association, a three-hundred-dollar bequest to the St. Joseph's Carmelite Monastery, in Seattle, and a five-hundred-dollar bequest to be held in trust for the education of Robert Swan. The testatrix named three relatives of her deceased husband and William P. Swan, a friend, to share the residue of her estate. The will provided that, in the event of the prior death of any of these residuary legatees, the share of such legatee should be divided equally between the two charitable organizations previously named. William P. Swan was named executor. The will was admitted to probate on June 19, 1957.
By codicil of September 6, 1956, the testatrix provided for the division of the residue among two of the relatives of her deceased husband and William P. Swan, the fourth residuary legatee having died after the execution of the will.
The contentions of the petitioners were that the will and the codicil were executed at times when Mary A. Malloy *567 lacked testamentary capacity and that they were obtained through the undue influence of William P. Swan. The trial court found that neither of these contentions was proved.
The record amply sustains the trial court's findings that Mary A. Malloy, at the time of the execution of the will and codicil, was of sound and disposing mind and memory and was then able to comprehend the nature of the business she was transacting, the extent of her property, and the natural objects of her bounty; that she was competent to transact her business, and to execute a will or other instrument disposing of her property and that she executed the will and codicil as her own intentional and voluntary act and deed, free of undue dominion and control on the part of William P. Swan, or any other person.
[1] The petitioners base their appeal upon two errors of law which they contend the court committed. The first of these was in refusing the admission of testimony of three of the heirs concerning statements made by the testatrix to them. They recognize that this court has held that RCW 5.60.030, commonly known as the dead man statute, applies to will contests and forbids a party in interest to testify in his own behalf as to any transaction had by him with, or any statement made to him or in his presence by, the deceased. This rule is set forth in In re Wind's Estate, 27 Wn. (2d) 421, 178 P. (2d) 731, 173 A.L.R. 1276, overruling In re Findley's Estate, 199 Wash. 669, 93 P. (2d) 318, and distinguishing In re Anderson's Estate, 114 Wash. 591, 195 Pac. 994.
In the latter case, this court held admissible testimony by a party in interest concerning the mental capacity of the deceased. Some of this testimony related to conversations with the deceased. In In re Wind's Estate, supra, this court stated that the decision in In re Anderson's Estate was proper insofar as it pertained to the witness' knowledge of the mental condition of the testator because "the mental condition of an individual could not be termed a transaction with one since deceased." We did not comment upon the applicability of RCW 5.60.030 where there is an attempt to prove the mental capacity of the testator, or his lack of it, by statements made by him to the witness, or in his *568 presence. It would appear that the language of the statute, to which this court gave full effect in In re Wind's Estate, supra, would exclude such testimony.
[2] However, we do not find it necessary to pass upon the question at this time. The offers of proof made by the petitioners tended to show merely that the testatrix was subject to occasional lapses of memory, which are common to persons of her age. They would not support a finding that she lacked testamentary capacity when she executed her will, either standing alone or when taken in conjunction with all of the other testimony. Even assuming that the testimony was admissible, its exclusion was harmless.
[3] There is likewise no merit in a contention made by the petitioners that the respondents waived the right to invoke the statute as to these witnesses by failing to object when the petitioner's attorney questioned Mr. Swan about conversations which he had had with the deceased. A waiver as to one transaction or conversation does not extend to unrelated transactions and conversations. Carter v Curlew Creamery Co., 16 Wn. (2d) 476, 134 P. (2d) 66. The proof offered by the petitioners did not pertain to any transactions or conversations about which Mr. Swan testified.
[4] The second error alleged by the petitioners, concerns the trial court's evaluation of the evidence. Again, they concede that one contesting a will which has been admitted to probate has the burden of proving the illegality of the will by evidence which is clear, cogent, and convincing. But they insist that there is evidence in this case which is sufficient to cast upon the respondents the burden of sustaining the validity of the will, under the rule laid down in Dean v. Jordan, 194 Wash. 661, 79 P. (2d) 331, wherein we said:
"To vitiate a will there must be something more than mere influence. There must have been an undue influence at the time of the testamentary act, which interfered with the free will of the testator and prevented the exercise of judgment and choice. (citing cases.)
"The evidence to establish fraud or undue influence must be clear, cogent, and convincing. (citing cases.)
*569 "Nevertheless certain facts and circumstances bearing upon the execution of a will may be of such nature and force as to raise a suspicion, varying in its strength, against the validity of the testamentary instrument. The most important of such facts are (1) that the beneficiary occupied a fiduciary or confidential relation to the testator; (2) that the beneficiary actively participated in the preparation or procurement of the will; and (3) that the beneficiary received an unusually or unnaturally large part of the estate. Added to these may be other considerations, such as the age or condition of health and mental vigor of the testator, the nature or degree of relationship between the testator and the beneficiary, the opportunity for exerting an undue influence, and the naturalness or unnaturalness of the will. The weight of any of such facts will, of course, vary according to the circumstances of the particular case. Any one of them may, and variously should, appeal to the vigilance of the court and cause it to proceed with caution and carefully to scrutinize the evidence offered to establish the will.
"The combination of facts shown by the evidence in a particular case may be of such suspicious nature as to raise a presumption of fraud or undue influence and, in the absence of rebuttal evidence, may even be sufficient to overthrow the will. In re Beck's Estate, 79 Wash. 331, 140 Pac. 340."
[5] The evidence in this case tended to show that Mrs. Malloy was an old lady of unusually alert mind and independence of will. The bulk of her estate had been acquired through the enterprise of her husband, who had died some thirty years previously. She had made her home for many years on a ranch at Ferndale, where her sister had lived with her until her death in 1954. After the sister's death, she went to California where she stayed with her nephew and his wife for several months, but grew homesick and dissatisfied and returned to Washington. Her nieces visited her from time to time, but she apparently was not very close to them. Shortly after her return, she began to rely on Mr. Swan, whom she had known since he was a child, and with whose mother she had been friends for many years. Mr. Swan, a man past sixty years of age, was regularly employed and had a wife and family, but he spent many of his days off from work driving Mrs. Malloy on her various *570 errands, which were predominantly visits to her lawyer, who was probating the estate of her sister. Thereafter, when she was confined to the hospital and later to a nursing home, he visited her often. Disinterested witnesses testified to his kindness to her and his concern for her welfare. None offered any support to the theory that he attempted to influence her in any way for his own benefit, or that he could have had he tried. The record more than justifies the trial court's summation, which we quote from the memorandum opinion:
"Now, we have a woman here who, I believe, according to the consensus of the opinion of all of the witnesses, almost all of them, was an unusual woman. She maintained her faculties up to very near the end of her life. The Court is of the opinion that she was a forceful woman and that she was not one to be pushed around or told what to do. And it would probably take a great deal of influence on an outsider's part to have any effect upon her will and her desires. The Court feels that Mr. Swan began this relationship with Mrs. Malloy in friendship, and we might say, was drafted to a certain extent into this position that he found himself in; that Mrs. Malloy was a demanding sort of person, and I believe that at times she overrode Mr. Swan's own personal desires to live a life of his own on Wednesdays, on his day off. She imposed upon him to a great extent; but I feel that the wills that she made and the acts that she did were her acts and not the acts of Mr. Swan."
We do not find in the record sufficient facts of a "suspicious nature" to warrant shifting the burden of proof to the shoulders of the respondents. It is a matter of conjecture whether a confidential relationship existed between Mrs. Malloy and Mr. Swan; he denied that she ever talked to him about her personal and business affairs, and there was no direct evidence that she did.
There was no evidence that he participated in the preparation or procurement of the will, other than the fact that the attorney she selected was one of those he recommended in response to her request that he suggest a Bellingham attorney to draw her will and the further fact that he drove her to the attorney's office on both occasions. She took her own handwritten notes to these conferences and *571 discussed the will and codicil in private. The attorney was certain that she was capable of handling her own affairs and knew what she was doing.
Considering the fact that Mrs. Malloy was not very close to her relatives, that Mr. Swan befriended her in her declining years, doing the things which relatives ordinarily would do, and that she bequeathed to him only one third of the residue of her estate, leaving two thirds to relatives of her deceased husband, whom she did not know very well, but to whom she felt a duty because the estate was acquired largely through his efforts, we do not think the bequest to Mr. Swan was unnaturally large.
We conclude that the facts shown in this case do not raise a presumption of undue influence, shifting the burden of proof to the respondents, and that the record sustains the findings of the trial court.
The judgment is affirmed.
FINLEY, C.J., HILL, WEAVER, and FOSTER, JJ., concur.
NOTES
[1] Reported in 358 P. (2d) 801.