[No. 46795-6-I. Division One. August 27, 2001.]

ESTATE OF ELSIE LENNON, *Respondent*, v. ROGER P. LENNON, *Appellant*.

---

[54] RCW 13.34.190(1), (2); *H.W.*, 92 Wn. App. at 425.

[55] *A.W.*, 53 Wn. App. at 33.

*Michael L. Olver* (of *Merrick & Olver, P.S.*), for appellant.

*Willard G. Smith, Jr.* (of *Eugene Decker Seligmann*), for respondent.

BAKER, J. — This is an action brought by the personal representative of the estate of Elsie Lennon to recover the proceeds from stock certificates sold by Roger Lennon, Elsie's stepson. Relying on the deadman's statute,[1] the estate submitted redacted portions of Roger's declaration and deposition in support of its argument that Roger converted the stocks for his own benefit and wrote unauthorized checks from Elsie's account. Roger argues that the estate waived the deadman's statute by submitting evidence of transactions with the decedent. The trial court

---

[1] RCW 5.60.030.

found that the estate did not waive the deadman's statute and granted summary judgment to the estate. We hold that the estate waived the deadman's statute with respect to the stock transaction but not the gift checks. Accordingly, we reverse summary judgment regarding the stock certificates and affirm regarding the gift checks. We also affirm the trial court's decision to deny an award of attorney fees to the estate.

I

Elsie Lennon died intestate on January 17, 1999. She was predeceased by her husband Edward Lennon, who died in 1995. Edward and Elsie were married in 1952. Roger, Edward's son from a previous marriage, lived with them until Roger purchased his first home in 1959. By all accounts, Roger and Elsie had a close personal relationship. Beginning in 1995, Roger began stopping at Edward and Elsie's home every morning to check on their needs. Not long before Edward's death, Elsie broke her hip in a fall and was admitted to a convalescent center before returning home. Elsie subsequently suffered two more falls, and Roger testified that he visited her each morning, left work to help her with bathroom problems, and slept on her couch for two to three weeks while she recovered. Roger also testified that he gave Edward and Elsie money each month starting in the late 1970s to help them out because he thought they were in need. He stopped giving them money in 1995 when he discovered that Edward had $50,000 in his checking account.

Roger testified that he was aware that his father had stock in Seattle First National Bank (SeaFirst) and Peoples Bank, and that both Edward and Elsie repeatedly stated that those stocks were to be his inheritance. Some of the stock certificates were in the name of Edward Lennon, some in the name of Elsie Lennon, and some in their joint names. Roger stated in his declaration that after his father died in October 1995, he and Elsie retrieved legal papers, including

the stock certificates, from Elsie's safe deposit box at Washington Mutual Bank. Roger testified at his deposition that he brought the contents of the box home and kept them in his safe for awhile "until she was ready to deal with it." He then brought everything to Elsie at her home. She inventoried all of the items. Because he did not want to go to the bank that day, he left the items that were to go back to the safe deposit box with Elsie. He took the stock certificates home and placed them in his home safe. Elsie did not know the combination to the safe and did not have access to them. Roger stated in his declaration that Elsie had delivered the stock certificates to him as his inheritance, and that he returned the house titles back to their safe deposit box at Elsie's direction.

Roger and Elsie brought the contents of the safe deposit box, along with Edward and Elsie's community property agreement, to estate planning attorney Charles Mullavey. Roger and Mullavey testified that Elsie said she wanted her estate to go to Roger when she died. Mullavey advised Elsie to execute a will, and they had an extended discussion regarding joint tenancy accounts. Elsie decided that she wanted Roger to be added to her accounts as joint tenant. On October 23, 1999, Roger and Elsie opened an account at Washington Mutual as joint tenants with right of survivorship (JTWROS). Roger does not dispute that the account consisted solely of funds deposited by Elsie. Elsie also gave Roger a general power of attorney on September 17, 1995.

The stock certificates remained in Roger's home safe until December 1998. At that time, Elsie fell again and was admitted to the hospital. Roger said that he offered to sell his stocks to pay for Elsie's home care because she did not want to stay in a nursing home. Roger took the stock certificates to Washington Mutual and asked them to sell the stocks and deposit them in the JTWROS account. The bank advised Roger that it could not cash the stocks, so he took them to SeaFirst and asked them to cash the stocks and put the money into his Washington Mutual account.

SeaFirst advised Roger that he needed to open two accounts for them to cash the stocks, so Roger agreed. He said that SeaFirst personnel determined how the accounts should be set up and filled in the application. The accounts were opened in the name of Elsie Lennon, with himself as trustee power of attorney. The SeaFirst accounts were established on December 15, 1998, and Roger delivered the stock certificates to that bank on the same day. Roger said that he told SeaFirst to liquidate the stocks and give him a cashier's check so he could deposit the proceeds into the JTWROS account at Washington Mutual. Proceeds from the sale of the stocks were placed in the SeaFirst account in several increments during February 1999. SeaFirst did not give Roger a check for the proceeds until after Elsie Lennon's death. Roger stated that it was his intent to liquidate the stocks to hire full-time care for Elsie, not to lose his ownership of the stocks because of the bank's slowness.

On January 15, 1999, two days prior to Elsie's death, Roger wrote and signed three checks from the JTWROS account. He wrote a check for $2,000 to himself, a check for $2,000 to his sister Diane Brown, and a check for $1,000 to Dara Morrow, who helped Elsie at her home. The checks were denominated as Christmas gifts.

Later that year, the personal representative of Elsie's estate caused a citation to be issued, directing Roger to appear and show cause why he should not return "any and all property belonging to the deceased." The parties appeared twice before a superior court commissioner, who ruled that the matter would be set for trial. The estate moved for partial summary judgment and requested "[a]n order excluding any testimony by Roger Lennon as to: transactions he had with the decedent; statements made to him by the decedent; and statements made to him by the decedent's late husband."

The trial court granted partial summary judgment in favor of the estate, held that the estate had not waived the protections of the deadman's statute, and denied the

estate's request for attorney fees. The court later entered an amended order adding a money judgment of $231,064.50 plus prejudgment interest and costs against Roger Lennon, dismissing the remaining issues and striking the trial date. Roger Lennon appeals from that order, and the Estate cross-appeals the court's refusal to award attorney fees.

## II

We review an order of summary judgment de novo.[2] All facts and inferences are considered in a light most favorable to the nonmoving party.[3] Summary judgment is appropriate where there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law.[4]

The deadman's statute, RCW 5.60.030, bars testimony by a "party in interest" regarding "transactions" with the decedent or statements made to him by the decedent.[5] A "party in interest" under RCW 5.60.030 is "[one] who stands to gain or lose in the action in question."[6] A "transaction" under the deadman's statute is broadly defined as " 'the doing or performing of some business between parties, or the management of any affair.' "[7] " '[T]he matter concerning which the testimony is given must involve some act by and between the parties for the benefit or detriment of one or both of the parties.' "[8] The test of a "transaction" is whether the deceased, if living, could contradict the witness

---

[2] *Schaaf v. Highfield*, 127 Wn.2d 17, 21, 896 P.2d 665 (1995).

[3] *Inniss v. Tandy Corp.*, 141 Wn.2d 517, 522, 7 P.3d 807 (2000).

[4] CR 56(c); *Reid v. Pierce County*, 136 Wn.2d 195, 201, 961 P.2d 333 (1998).

[5] RCW 5.60.030 states in relevant part: "That in an action or proceeding where the adverse party sues or defends as executor, administrator or legal representative of any deceased person . . . then a party in interest or to the record, shall not be admitted to testify in his or her own behalf as to any transaction had by him or her with, or any statement made to him or her, or in his or her presence, by any such deceased . . . person . . . ."

[6] *Bentzen v. Demmons*, 68 Wn. App. 339, 344, 842 P.2d 1015 (1993).

[7] *Bentzen*, 68 Wn. App. at 344 (quoting *In re Estate of Wind*, 27 Wn.2d 421, 426, 178 P.2d 731 (1947)).

[8] *Bentzen*, 68 Wn. App. at 344 (quoting *In re Estate of Wind*, 27 Wn.2d at 426).

of his own knowledge.[9] When it appears that there was a personal transaction with the deceased and the testimony offered tends to show either what did or did not take place between the parties, it must be excluded so long as it concerns the transaction or justifies an inference as to what it really was.[10] However, the deadman's statute does not prevent an interested party from testifying regarding his or her own feelings or impressions.[11]

The deadman's statute may be waived when the protected party introduces evidence concerning a transaction with the deceased.[12] Once the protected party has opened the door, the interested party is entitled to rebuttal.[13] A waiver by introduction of testimony about one transaction does not extend to unrelated transactions and conversations.[14] Engaging in pretrial discovery, including taking depositions or propounding interrogatories, does not waive the deadman's statute unless a representative of the estate introduces the deposition or interrogatories into evidence.[15]

Relying on *McGugart v. Brumback*, Roger first argues that the estate waived the protection of the deadman's statute per se by introducing his redacted declaration and deposition into evidence. We disagree. The *McGugart* court held that the "mere taking of a deposition or propounding of interrogatories is not a waiver of the statute's bar when the deposition or interrogatories are not introduced in evidence by a representative of the estate."[16] But there is nothing in

---

[9] *Bentzen*, 68 Wn. App. at 344.

[10] *Martin v. Shaen*, 26 Wn.2d 346, 352, 173 P.2d 968 (1946).

[11] *Jacobs v. Brock*, 73 Wn.2d 234, 237-38, 437 P.2d 920 (1968).

[12] *McGugart v. Brumback*, 77 Wn.2d 441, 450, 463 P.2d 140 (1969); *Bentzen*, 68 Wn. App. at 345.

[13] *Johnston v. Medina Improvement Club, Inc.*, 10 Wn.2d 44, 59-60, 116 P.2d 272 (1941); *Bentzen*, 68 Wn. App. at 345.

[14] *In re Estate of Malloy*, 57 Wn.2d 565, 568, 358 P.2d 801 (1961).

[15] *McGugart*, 77 Wn.2d at 449.

[16] *McGugart v. Brumback*, 77 Wn.2d 441, 449, 463 P.2d 140 (1969) (citation omitted).

*McGugart* or subsequent cases which supports Roger's theory that a party effectuates a per se waiver of the deadman's statute by introducing a deposition after redacting all evidence of a transaction with the decedent. Courts regularly allow portions of an affidavit offered by the interested party into evidence while striking those portions that violate the deadman's statute.[17] Similarly, the adverse party may offer evidence gathered during pretrial discovery without waiving the deadman's statute so long as evidence of transactions between the interested party and the decedent have been completely purged.

■ Next, Roger argues that the estate waived the deadman's statute by failing to object to the declaration he submitted at four court appearances below. These included two appearances before a superior court commissioner for the purpose of obtaining a trial date; an appearance in superior court regarding the estate's petition objecting to mediation; and an appearance on the summary judgment motion that is presently being appealed. Failure to timely object to the testimony of an interested party waives the bar of the deadman's statute.[18] But Roger has not shown that the first two court appearances were contested hearings. In the estate's motion for summary judgment, the personal representative stated that "[b]y agreement of the parties, the matter was set for an expedited trial date without the necessity of any dispositive rulings by the court on the materials that have been filed by the parties." Counsel for the estate also testified that this agreement was made. The estate did invoke the protection of the deadman's statute at the mediation hearing and in its motion for partial summary judgment. Therefore, the estate did not waive the statute by failure to object.

■ Next, Roger asserts that the estate waived the deadman's statute by failing to redact from its summary judgment submittal all evidence of his transactions with

---

[17] *Wildman v. Taylor*, 46 Wn. App. 546, 555, 731 P.2d 541 (1987).

[18] *In re Estate of Dand*, 41 Wn.2d 158, 167, 247 P.2d 1016 (1952).

Elsie. Roger urges us to broadly define "transactions" in this context to include all testimony regarding the gifting, safekeeping, and liquidation of the stock certificates. The estate contends that this evidence merely traced the physical trail of the stock certificates and the proceeds from their sale, and that all evidence of Elsie's donative intent was purged from the transcripts. Therefore, according to the estate, it did not submit evidence of a "transaction" with the decedent.

Deadman's statutes are designed to "prevent frauds upon the estates of those who are no longer present to defend themselves."[19] The waiver doctrine "eliminates what would otherwise be a flagrant injustice in the statute."[20] The policy behind the waiver doctrine is that "[i]t would, however, be palpably unjust to permit the representative of a deceased person to use the adverse party to the extent that it might aid him in defeating a claim or in establishing an independent claim in favor of the estate, and then claim the benefit of the statute when the adverse party sought to qualify or explain his testimony."[21] As the four dissenting justices in *McGugart* noted, the majority's rule in that case permits the estate to "explore . . . every facet of the claimant's cause; extract and shrewdly utilize the favorable information while discarding the unfavorable matter; and at trial force the claimant to overcome not only the unusually heavy burden of proof but also the restrictions of the deadman's statute."[22] Prior to *McGugart*, the adverse party faced the "Hobson's choice" of standing on the deadman's statute or risking waiver by pursuing pretrial discovery. After *McGugart*, conducting pretrial discovery no longer constitutes an automatic waiver, but the adverse party still

[19] *McGugart*, 77 Wn.2d at 444.

[20] *McGugart*, 77 Wn.2d at 445.

[21] *Robertson v. O'Neill*, 67 Wash. 121, 124, 120 P. 884 (1912); *see also Johnson v. Peterson*, 43 Wn.2d 816, 818, 264 P.2d 237 (1953) (holding that plaintiff cannot use the testimony of defendant insofar as it might be of assistance to establish the claim of the estate, while asserting the deadman's statute to render defendant's explanatory testimony incompetent).

[22] *McGugart*, 77 Wn.2d at 457-58.

bears the risk of waiving the deadman's statute by introducing evidence of a transaction with the decedent.

We agree with the estate that the proper scope of a "transaction" for purposes of waiving the deadman's statute does not encompass all evidence regarding the physical trail of the stock certificates and proceeds. The test of a "transaction" is whether the deceased, if living, could contradict the witness of his own knowledge.[23] Therefore, to constitute a transaction, the testimony must indicate that the decedent was both present and directly involved in the matter at hand. Elsie was not present when Roger took the stock certificates to the bank, liquidated them, and placed the proceeds in his account. Without direct personal knowledge, she would not be able to contradict Roger's testimony regarding those actions.

However, contrary to the estate's characterization of the matter, the testimony it submitted went beyond merely tracing the physical trail of the stock certificates. The estate failed to redact evidence that Roger brought the contents of the safe deposit box, including the stock certificates, to Elsie at her home. Furthermore, there is evidence that Elsie inventoried the materials and kept everything except the stock certificates, which Roger brought to his home. We are particularly concerned with the following testimony submitted by the estate:

Q: As I understand it, Mr. Lennon, it [the contents of the safe deposit box] went from the bank to your home?

A: To her house.

Q: To her house or your home?

A: It went from the bank to her house.

Q: Oh, I thought it went from the bank to your house.

A: Let's see—yes it did the first—when I took it, looking for the papers.

Q: And then you kept them in your safe for awhile.

A: Until she was—

[23] *Bentzen*, 68 Wn. App. at 344.

Q Until she was ready·to deal with it?

A: Yes.

Q: So, it goes from bank deposit box to Roger Lennon's office safe. From Roger Lennon's office safe, it went to Elsie's house for a visit.

A: Yes.

Q: And you brought everything to Elsie's house?

A: Yes.

. . .

Q: I'm characterizing generally the kinds of things that were in the box that had been taken to your home and then brought to Elsie. We've got deeds. We've got contracts. There may be insurance policies or not. There may be the Washelli Cemetery type papers. Maybe some photographs, other personal documents, and the stock certificates. . . .

Things like that were brought with the stock certificates from your safe to Elsie's home?

A: Yes.

Q: [Redacted]

A: [Redacted]

Q: Who else was there?

A: Nobody.

[18 lines redacted]

Q: So, following that visit with the inventory of the contents of the box, you then went to your home next, or did you go to the bank next?

A: I'm sure I went to the bank, not the same day because it's out of my way. . . . I left it with her. She had everything rubber-banded [redacted].

Q: I'm sorry, you left what with her?

A: Meaning when she had gone through all that stuff, she had it all rubberbanded [redacted].

Q: So, you left the materials that were to go back into the safe deposit box with Elsie—

A: Yes.

Q: —for another day to return to the bank?

A: Whatever day I was going in.

Q: And you took the stock certificates home with you.

A: Home.

Q: And that was sometime in late 1995?

A: Yes. . . .

Looking at this testimony in the light most favorable to Roger, the nonmoving party, we hold that this testimony concerns a "transaction" between Roger and Elsie for purposes of waiving the deadman's statute. Roger brought the entire contents of the safe deposit box to Elsie. She inventoried it and "had it all rubberbanded." He left the items that were to be returned to the safe deposit box with Elsie. From this testimony, it can be inferred that Elsie knew Roger took the stock certificates home with him. He left the items that were to be returned to the safe deposit box with her, and the stock certificates were not among them. The stock certificates were in "big envelopes." It is reasonable to infer that their absence would have been conspicuous to Elsie. After that, the stock certificates remained in Roger's safe for the next three years until he took them to the bank to liquidate them soon before Elsie's death.

The estate contends that these portions of Roger's deposition testimony do not constitute a "transaction" because all evidence of Elsie's donative intent was redacted. The estate apparently misunderstands the proper test of a "transaction," which is whether the deceased, if living, could contradict the witness of his own knowledge. Elsie, if alive, could contradict the circumstances surrounding her inventory of the contents of the safe deposit box and the inference that she knowingly allowed Roger to take the stock certificates home.

Because the estate opened the door by introducing this evidence, Roger is entitled to introduce evidence of Elsie's words or actions to explain the nature of this transaction. This testimony goes to the heart of Roger's claim that Elsie made an inter vivos gift of the stock certificates to him in 1995. The essential elements of a valid

gift are (1) an intention on the part of the donor to presently give; (2) a subject matter capable of passing by delivery; and (3) an actual delivery at the time.[24] Roger may satisfy the first and third elements by testifying that Elsie intended to give him the stock certificates as his inheritance and that she actually delivered them at that time. The second element is satisfied because stock certificates are capable of actual or constructive delivery.[25] Roger will bear the heavy burden at trial of proving that a gift occurred by clear, cogent, and convincing evidence.[26] However, this standard is not applicable for purposes of summary judgment. Rather, the nonmoving party "is entitled to all favorable inferences that may be deduced from the varying affidavits."[27] Consequently, we hold that Roger has introduced sufficient evidence to create a genuine issue of material fact for trial on this issue.

Roger also points to the declarations of Kelly Carpenter, Mary Ellen Swanson and Charles Mullavey, as well as his own history of financial support and caregiving for Elsie, in support of his contention that Elsie had general donative intent. This evidence is not barred by the deadman's statute because the declarants are not parties in interest. But these witnesses do not provide any testimony as to Elsie's intent regarding the stock certificates. They testified that Elsie was fond of Roger and that Edward and Elsie wanted their estate to pass to Roger upon their deaths. But this evidence does not help Roger establish that Elsie intended to make an inter vivos gift of the stock certificates to him. Similarly, Roger's testimony that he did not intend to give up his ownership of the stocks does not prove Elsie's intent. However, given that the estate waived the deadman's statute with respect to the previously discussed transac-

---

[24] *Henderson v. Tagg*, 68 Wn.2d 188, 192, 412 P.2d 112 (1966).

[25] *Henderson*, 68 Wn.2d at 193.

[26] *Doty v. Anderson*, 17 Wn. App. 464, 471, 563 P.2d 1307 (1977); *Pedersen v. Bibioff*, 64 Wn. App. 710, 720, 828 P.2d 1113 (1992).

[27] *Estate of Randmel v. Pounds*, 38 Wn. App. 401, 405, 685 P.2d 638 (1984).

tion, Roger has provided enough admissible evidence to overcome summary judgment on this issue.

## III

Roger argues that he had authority to write the "Christmas checks" from the JTWROS account while Elsie was alive because he was a signator on the account and had power of attorney. Roger contends that he may testify that Elsie specifically instructed him to write the gift checks because the estate waived the deadman's statute by submitting redacted portions of his deposition testimony regarding the checks. The estate argues that although Roger was a signatory and a joint tenant on the account and had power of attorney, he did not have any ownership interest in the funds prior to Elsie's death and had no right to unilaterally make gifts from that account. The estate also argues that it redacted all evidence of a transaction with the decedent from Roger's deposition.

The estate's analysis is correct. The Financial Institution Individual Account Deposit Act defines a "joint account with right of survivorship" as "an account in the name of two or more depositors and which provides that the funds of a deceased depositor become the property of one or more of the surviving depositors."[28] When determining the rights of individuals to funds in an account, the act defines a "depositor" as "an individual who owns the funds."[29] During the lifetime of a depositor, funds in a joint account with right of survivorship "belong to the depositors in proportion to the net funds owned by each depositor on deposit in the account, unless the contract of deposit provides otherwise or there is clear and convincing evidence of a contrary intent at the time the account was created."[30] These statutes create a rebuttable presumption that joint accounts with right of survivorship do not give a nondepos-

---

[28] RCW 30.22.040(8).

[29] RCW 30.22.040(11).

[30] RCW 30.22.090(2).

iting party any present interest in the account funds.[31] Furthermore, an attorney-in-fact has no power "to make any gifts of property owned by the principal" unless the document specifically provides otherwise.[32]

Here, Elsie was the sole depositor of funds into the account and there is no evidence indicating an intent to transfer a present interest in the funds to Roger. The power of attorney executed by Elsie did not grant Roger the power to make gifts. Roger does not deny that the checks were written two days before Elsie's death. Therefore, Roger had no authority to write the Christmas checks unless he can introduce evidence that Elsie specifically instructed him to do so.

But, unlike the deposition testimony regarding the stock certificates, here the estate redacted all testimony that might be construed as a transaction. Therefore, the deadman's statute remains in force as to this event, and Roger is barred from testifying that Elsie instructed him to write the Christmas checks. Consequently, Roger has not provided enough admissible evidence on this issue to create a question of material fact, and summary judgment was properly granted to the estate on this issue.

Roger also contends that the estate has no standing to recoup the funds because only Elsie, her attorney-in-fact or a guardian would have had standing to recoup wrongful distributions from the JTWROS account during Elsie's life, and now that the account is his, only he has standing to recover wrongful distributions from it. The estate argues that the funds are owed to Elsie's estate, not to Roger's JTWROS account, because Roger gave away Elsie's property while she was alive. The estate is correct. It is true that if Roger had not written the checks, those funds would have passed to him as the sole remaining signator on the JTWROS account. But Roger improperly frames the issue in terms of where the money would be if he had not written

---

[31] *Morse v. Williams*, 48 Wn. App. 734, 740-41, 740 P.2d 884 (1987).

[32] RCW 11.94.050(1).

the checks. He did in fact write them, and he cannot prove that he was authorized to do so. Therefore, the estate has standing to recoup the funds.

## IV

Former RCW 11.96.140 (1998)[33] grants the court discretion to award attorney fees and costs "as justice may require."[34] A trial court's decision to award or deny fees under former RCW 11.96.140 will not be overturned except on a clear showing of abuse of discretion.[35] In *Gillespie v. Seattle-First National Bank*,[36] the court held that an award of attorney fees was necessary to make the beneficiaries whole following a breach of fiduciary duty.[37]

The estate argues that the trial court abused its discretion in refusing to award fees and costs under RCW 11.96.140 because Roger breached his fiduciary duty to Elsie by converting her stock for his own benefit and writing the "Christmas checks." We disagree. We hold that Roger has overcome summary judgment on the primary issue of the stock certificates. But even assuming arguendo that the estate did not waive the deadman's statute, the trial court merely found that Roger did not produce enough admissible evidence to prove the elements of an inter vivos gift and overcome the estate's motion for summary judgment. It does not automatically follow that Roger flagrantly breached his fiduciary duty to Elsie by taking the stock

---

[33] RCW 11.96.140 was repealed by Laws of 1999, ch. 42, § 637, effective January 1, 2000. It was replaced by RCW 11.96A.150, which states that "(1) Either the superior court or the court on appeal may, in its discretion, order costs, including reasonable attorneys' fees, to be awarded to any party: (a) From any party to the proceedings; (b) from the assets of the estate or trust involved in the proceedings; or (c) from any nonprobate asset that is the subject of the proceedings. The court may order the costs to be paid in such amount and in such manner as the court determines to be equitable."

[34] *In re Estate of Tolson*, 89 Wn. App. 21, 38, 947 P.2d 1242 (1997).

[35] *In re Korry Marital Deduction Trust*, 56 Wn. App. 749, 755, 785 P.2d 484 (1990).

[36] 70 Wn. App. 150, 855 P.2d 680 (1993).

[37] *Gillespie*, 70 Wn. App. at 178.

certificates without her knowledge and cashing them for his own benefit. Under these circumstances, we hold that the trial court did not abuse its discretion in declining the estate's request for attorney fees. We also deny the estate's request for attorney fees incurred in this appeal.

Reversed in part and affirmed in part.

KENNEDY and Cox, JJ., concur.