IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON
DIVISION THREE

| | | |
|---|---|---|
| In the Matter of the Estate of | ) | No. 37519-6-III |
| | ) | |
| | ) | |
| MARILYN SUE HEIN. | ) | PUBLISHED OPINION |
| | ) | |

SIDDOWAY, J. — John Hein, the surviving spouse of the late Marilyn Sue Hein,

appeals the trial court's denial of his petition for an award under chapter 11.54 RCW

from Marilyn's[1] share of the couple's community property. Marilyn's will left all of her

property to her only child, a son from a prior relationship.

---

[1] Given the couple's common last name we use their first names for clarity. For
parity, we refer to Marilyn's son by his first name as well. We intend no disrespect.

Chapter 11.54 RCW, like chapter 11.52 RCW before it, creates rights in a surviving spouse and children to petition for an award of a limited priority amount of the decedent's property. The statutory right presents a clear prospect of disturbing the dispositive plan set forth in the decedent's will, but it does so by design.

Unlike former chapter 11.52 RCW, current law does not refer to a presumptive basic award as an "award in lieu of homestead," or to a need-based increase in the award as a "family allowance" or "maintenance." Presumably this was in the interest of simplicity. But the manner in which the now-singular award is calculated makes clear that it continues to comprise an "award in lieu of homestead"-like "basic award" and a "family allowance"-like or "maintenance"-like "increase" in the basic award.

The elimination of different labels for these two components led to confusion in this case. It led Marilyn's son to argue, incorrectly, that in determining whether to award an amount to John, the trial court's analysis must be entirely need-based and hold John to a clear and convincing standard of proof.

Because Marilyn was survived by a son who was not John's child and awarding property to John would decrease amounts otherwise distributed to her son, the superior court enjoyed discretion to award John less than the basic award and to deny him an award altogether. But the standard the trial court was persuaded to employ applies only to RCW 11.54.040, which authorizes a need-based increase to the basic award, not the

2

basic award itself. Because the court applied an incorrect standard and burden of proof in ruling on John's request for the basic award, we reverse in part and remand for further proceedings.

FACTS AND PROCEDURAL BACKGROUND

Marilyn Hein passed away on September 26, 2018, following a more than decade long battle with cancer. She was survived by her husband John, to whom she had been married for 32 years and with whom she had lived for 38 years.

Marilyn's will, executed in January 2013, named Vaughn Start, her only child from a prior relationship, as her personal representative and sole beneficiary. Her will explicitly left nothing to John. Following Marilyn's death, Vaughn, who had caused his mother to be admitted to a nursing home in King County six weeks or so before she died, filed her original will with the King County Superior Court. He did not initiate a probate proceeding.

John and Marilyn had lived in Moses Lake since early 2017, and a month after Marilyn's death, John filed a copy of her will with the Grant County Superior Court and petitioned for an order admitting the will to probate. He sought appointment as personal representative "pursuant to RCW 11.28.030," which permits a surviving spouse to administer a decedent's community property notwithstanding any provisions of the will

3

to the contrary. Clerk's Papers (CP) at 13. The court granted the petition. John later identified Marilyn's estate as consisting of the following assets, with the following values as of December 2019:

| | |
|---|---|
| Edward Jones account ending in 10-1-5 | $205,000 |
| Edward Jones account ending in 90-1-9 | $105,000 |
| Chase Bank account | Less than $1,500 |
| Furniture and household goods | Negligible |
| 1985 Silvercrest mobile home | $40,000 |
| 2016 Ford Fusion | $10,000 |
| Diamonds and other jewelry in the possession of Vaughn | $40,000 |
| TOTAL (approximate): | $401,500 |

CP at 32-33. Vaughn appears to dispute only that Marilyn owned $40,000 worth of jewelry.

Several months later, John filed a petition seeking relief under TEDRA[2] against Vaughn and his wife. The TEDRA proceeding was consolidated with the probate. Claims in the TEDRA proceeding placed before the superior court John's and Vaughn's dramatically different characterizations of the quality of Marilyn's marriage to John and the extent of Vaughn's solicitude and support during the terminal stage of Marilyn's illness.

---

[2] The Trust and Estate Dispute Resolution Act, RCW 11.96A.090.

The following facts appear undisputed: At the time Marilyn and John began living together, Vaughn was around 10 years old. Not long after their marriage, John and Marilyn bought acreage in Bothell that had, in addition to a home, a large barn and paddocks. They ran a horse-boarding business together from the property for almost 30 years.

Marilyn was diagnosed in 2004 or 2005 with stage 4 breast cancer that had metastasized to her lungs, liver, bones, and brain. It went into remission for at most a year, and then spread. Over the years, she had to undergo treatment for cancer in her spine, her chest, and her brain.

By 2016, the horse-boarding business was proving too much for the couple given Marilyn's cancer and John's own health problems. They sold the Bothell property in December 2016, with the requirement that they vacate by the end of January 2017.

Proceeds from the property sale totaled over $400,000, which the couple divided. Each deposited their share into an Edward Jones investment account in his or her name. In opening the account in her name in May 2017, Marilyn named Vaughn as the beneficiary. John named his sister as the beneficiary of the account in his name.

John used the funds in the Edward Jones account in his name to purchase a mobile home in Moses Lake, to which he moved in February 2017. After John and Marilyn

completed their move out of the Bothell property at the end of January 2017, Marilyn

traveled to Arizona to visit a cousin and then joined John in Moses Lake about a month

later.

Turning to disputed matters, Vaughn contends that John treated Marilyn in a

condescending and belittling manner, and that she had long been unhappy in her

marriage. It was undisputed that she filed for divorce in 2017. She dismissed the divorce

action in February 2018, however, averring that she no longer wished to dissolve her

marriage. Vaughn testified in proceedings below that it was his understanding she

dismissed the divorce "due to [her] deteriorating condition, her poor financial position,

and [John's] uncooperativeness with the divorce proceedings." CP at 145. By contrast,

Vaughn characterized Marilyn as having a very close relationship with him and his wife,

which he supported with evidence of text messages and holiday cards.[3] He testified that

he was unable to accommodate a visit from her in 2018 because he was dealing with

problems caused by a pituitary tumor.

---

[3] Both parties offered evidence that was arguably hearsay and arguably inadmissible under the "dead man's statute," RCW 5.60.030. One or both of the parties might have waived the statute. *See, e.g*, *Est. of Lennon v. Lennon*, 108 Wn. App. 167, 175, 29 P.3d 1258 (2001) (dead man's statute may be waived when the protected party introduces evidence regarding a transaction with the deceased). The trial court ruled on objections for a time, but eventually informed the parties that, it being a bench trial, it could "whittle this out later." Report of Proceedings (RP) at 98. *See State v. Melton*, 63 Wn. App. 63, 68, 817 P.2d 413 (1991) ("A trial judge is presumed to be able to disregard inadmissible evidence.").

For his part, John testified that Marilyn's divorce filing, which coincided with the sale of the Bothell property, was based on advice she was receiving on health care planning and preservation of resources. He testified they had a loving, committed marriage, but that Marilyn's wish, if "things got bad," was to be in the Seattle area, where Vaughn was, so that Vaughn could care for her. RP at 71. He testified it was Marilyn's understanding that she would have a better chance getting affordable housing if she had more limited assets.

By early 2018, Marilyn's cancer was diagnosed as terminal and treatment was discontinued. Beginning in mid-March, she received visits from Assured Hospice, a Grant County hospice provider, two to three times a week. John contends that Marilyn became increasingly unhappy with Vaughn in 2018 because Marilyn and Vaughn both knew she was dying, she was desperate to spend time with him and her grandchildren, and Vaughn rebuffed her requests to visit them at their home on Bainbridge Island.[4] After John and Marilyn moved to Moses Lake in early 2017, John could recall only one time when Vaughn and his wife visited: they stopped to have lunch with Marilyn somewhere near I-90 when they were passing through.

---

[4] Evidence was offered below that Marilyn's disappointment led her to change the beneficiary designation on her Edward Jones account to John in mid-July, only to change it back to Vaughn in late August. These changes and the circumstances surrounding them are likely to be deemed relevant to the decision to be made on remand, but they are not relevant to the issues on appeal.

John acknowledged in proceedings below that Marilyn telephoned and spoke with Vaughn often. John claims she frequently was tearful afterwards because Vaughn would tell her she slurred her words and accused her of being addicted to drugs. John testified that Marilyn was "devastated" when Vaughn rebuffed her proposal that she visit in May 2018, to celebrate Mother's Day and her birthday, which she assumed would be her last. Report of Proceedings (RP) at 91.

On July 28, 2018, Vaughn appeared without forewarning at John's and Marilyn's mobile home. According to John, Vaughn said he was going to take Marilyn to see her grandchildren. John did not recognize Vaughn, not having seen him for a dozen or so years. When told it was Vaughn and why he had come, John claims he was pleased, knowing how excited Marilyn would be at the prospect of a trip to see her grandchildren. Vaughn drove Marilyn as far as Issaquah, where he checked her into the emergency room at Swedish Hospital, which he explains was "to get her help or at least check out her condition." CP at 148. He later had her transferred from the hospital to the Providence Mount St. Vincent's nursing home in Seattle.

On August 16, Vaughn commenced a vulnerable adult protection order (VAPO) proceeding against John in King County Superior Court, accusing John of financial and mental abuse of Marilyn. He obtained a temporary order preventing John from having any contact with her. At the hearing that took place two weeks later, the order was

modified so that John could phone Marilyn, but according to John, in the many calls that he attempted to place to Marilyn, the nursing home seldom put him in contact with her. Vaughn had relieved Marilyn of her cell phone. According to nursing home records, Vaughn had directed the nursing home that she not have a telephone in her room.

On September 26, John was notified that Marilyn was failing and he would be allowed to visit her. He drove that day to Seattle to see her but was notified en route that she had passed away.

The guardian ad litem (GAL) in the VAPO proceeding filed a report thereafter. The report describes the issues precipitating the VAPO proceeding:

> Mrs. Hein's son, Vaughn Start picked her up from her home in Moses Lake, WA on 7/28/18 with concerns regarding her health and safety. He indicated the two months before he picked up his mother, she bombarded him with texts and phone calls wanting to come live with him. He reported her speech during phone calls was often slurred and made no sense. He told the GAL he was exhausted from the texts and phone calls and did not understand her slurred speech. He indicated he spoke to Assured Hospice but did not believe what they told him. Hospice told him this behavior was part of her brain metastasis and dying process. She was not on medications, including not on narcotics.
> Mr. Start made the decision to go to his mom's home and extract her from what he believed was a dire situation. It was confirmed that Mr. Hein and Mr. Start had not seen each other between 10-14 years.

CP at 508-09.[5]

---

[5] The GAL's report also states, "Mr. Start had not been to the Moses Lake home since his mom moved there in early 2017 and he last saw his mom around Easter 2018 when she drove to his home on Bainbridge [Island] for a visit." CP at 509. That Vaughn had not been to the Moses Lake home appears to be correct. The statement that Marilyn

Among consistent information the GAL reported receiving from individuals and professionals was the following:

> Marilyn Hein was an anxious woman who made the decision to go on hospice because her body was riddled with cancer and she was going to die in a number of months. Mrs. Hein constantly texted and called family, friends and medical providers telling them she was starving, confused and wanted to live with Vaughn. This behavior was worsening due to the brain metastasis. She was not easily redirected, eased or calmed. Professionals provided information that Mrs. Start [sic] had mental health issues that were lifelong and exacerbated by the brain metastasis. She was not on medication for pain or mind altering medications. This was true still at Providence St. Vincent when the GAL saw her on 9/11. Mr. Start had her phone after her admission to Providence St. Vincent. Mrs. Hein's repeated calls to people thereafter stopped.

CP at 510.

The GAL reported that she had been unaware of the sharp decline in Marilyn's condition in the days leading up to her death. She reported that her investigation had "found no evidence of abuse or neglect by John Hein" and no evidence "of financial exploitation by Vaughn Start or John Hein." CP at 506. Her recommendation was going to be that the VAPO be dismissed and that a health care directive naming Vaughn as agent be revoked and that John resume that role. She was going to recommend that Vaughn continue to hold his financial power of attorney. She was going to recommend that Marilyn not be moved back to Moses Lake "not due to a belief of neglect" but because "she requires a high level of care and is too medically fragile to be transported

---

drove to Bainbridge Island for an Easter visit is inconsistent with all of the testimony and documentary evidence below. *See, e.g*, RP at 140; CP at 131, 546.

10

such a distance." CP at 507. Marilyn had also told the GAL that "she did not want to be alone with Mr. Hein but wanted to see and talk to him." CP at 507.

Following the initial TEDRA hearing that took place on May 14, 2019, Vaughn unsuccessfully challenged venue in Grant County and John's appointment to serve as personal representative. In response to Vaughn's motion to dismiss John's claims, John requested leave to amend the TEDRA petition to drop claims other than claims for an award in lieu of homestead and family allowance, and for breach of fiduciary duty. The trial court allowed only the claims for an award in lieu of homestead and family allowance to go forward.[6] Vaughn opposed the amended petition and petitioned for his own family allowance.

In November 2019, the court conducted a several hours-long hearing on the TEDRA petition. The only witness to testify was John. In arguing the law to be applied, the lawyers advanced completely different understandings of the factors to be considered by the court. Both parties often referred to the statutory award available under current law as a family allowance. John's lawyer argued that the starting figure for the family allowance was $125,000, and it could be increased after considering statutory factors. Vaughn's lawyer argued that John was relying on old law, and under current law, the

---

[6] John's amended TEDRA petition sought an award in lieu of homestead under RCW 11.52.010 and family maintenance under RCW 11.54.040. He later acknowledged misciting a former version of the relevant statute and clarified that he was seeking the award available under chapter 11.54 RCW.

11

only issue was whether John had shown a financial need for a maintenance allowance during the probate.

After permitting and reviewing posthearing submissions by the parties, the trial court announced its decision in a letter ruling. As relevant on appeal, it stated:

> This Court has considered the factors enumerated in RCW 11.54.010 et seq. The Court has wide discretion in considering an award and after such consideration, has decided that a family allowance award is not appropriate here.
>
> The Court notes that Mr. Hein must demonstrate by clear, cogent and convincing evidence that his present and reasonable anticipated future needs for basic maintenance and support during the pendency of the probate of his late wife's estate will not be available to him from other sources. RCW 11.54.040(1); see In re Estate of Garwood, 109 Wash. App. 811, 38 P.3d 362 (2002). He has not done so.
>
> Mr. Hein's petition is denied.

CP at 298.

An order on petition for family allowance was entered thereafter that dismissed the TEDRA petition. John appeals.

ANALYSIS

The dispositive issue on appeal is whether the trial court properly applied the provisions of chapter 11.54 RCW.[7] We review de novo the meaning of a statute with the

---

[7] A threshold timeliness challenge by Vaughn can be addressed summarily. Vaughn argues that while John filed a notice of appeal within 30 days of the order dismissing the TEDRA petition, it was filed more than 30 days after the trial court's letter ruling denying the petition.

"Washington case law has long considered letter rulings as preliminary or

principal objective of effectuating the legislature's intent. *In re Est. of Garwood*, 109

Wn. App. 811, 814, 38 P.3d 362 (2002) (citing *Cockle v. Dep't of Labor & Indus.*, 142

Wn.2d 801, 807, 16 P.3d 583 (2001)). In assessing legislative intent, we look first to the

language of the statute. *Id.* (citing *In re Custody of Smith*, 137 Wn.2d 1, 8, 969 P.2d 21

(1998), *aff'd sub nom. Troxel v. Granville*, 530 U.S. 57, 120 S. Ct. 2054, 147 L. Ed. 2d

49 (2000)). If the language of the statute is clear and unambiguous, we go no further. *Id.*

(citing *Cherry v. Mun. of Metro. Seattle*, 116 Wn.2d 794, 799, 808 P.2d 746 (1991)).

When the statutory language is ambiguous, resorting to aids to construction, including

legislative history, is appropriate. *Id.* (citing *Harmon v. Dep't of Soc. & Health Servs.*,

134 Wn.2d 523, 530, 951 P.2d 770 (1998)).

I.      The basic award provided by RCW 11.54.010 and .020 serves the same purpose
        as the former homestead or award in lieu of homestead. The superior court
        applied the wrong standard and burden of proof in denying John's request for the
        basic award.

        Subject to conditions that are not at issue here,[8] a surviving spouse may petition

---

tentative decisions subject to change before a final decision that begins the time for an
appeal." *In re Marriage of Tahat*, 182 Wn. App. 655, 672, 334 P.3d 1131 (2014). Even
where a letter ruling contains most of the necessary elements of a final judgment, a party
cannot appeal until a formal order is entered. *State v. Knox*, 86 Wn. App. 831, 836, 939
P.2d 710 (1997), *overruled on other grounds by State v. O'Neill*, 148 Wn.2d 564, 62 P.3d
489 (2003).

[8] Funeral expenses, expenses of last sickness, and expenses of administration must
have been paid or provided for, and the surviving spouse must not have participated in
the willful and unlawful killing of the decedent. RCW 11.54.030.

the court for an award from the property of a decedent. RCW 11.54.010(1). The amount

of the basic award "shall be" the amount of the RCW 6.13.030(2) homestead exemption

with respect to lands, which was $125,000 at the time of Marilyn's death. RCW

11.54.020. The award has priority over all other claims made in the estate. RCW

11.54.060(1). It may be made from either the community property or separate property

of the decedent. RCW 11.54.010(2). Unless otherwise ordered by the court, the probate

and nonprobate assets of the decedent abate in accordance with chapter 11.10 RCW in

satisfaction of the award. *Id.*

The basic award to a surviving spouse can be decreased by the court in only three

situations. RCW 11.54.050. The first is if the surviving spouse is entitled to receive

probate or nonprobate property, including insurance, "by reason of the death of the

decedent." RCW 11.54.050(1). In that event, the court has discretion to decrease the

basic award, but "by no more than the value of such other property as is received by

reason of the death of the decedent." *Id.* Authority to decrease the award under RCW

11.54.050(1) has no application to this case. John did not receive probate or nonprobate

property "by reason of" Marilyn's death.

The third situation in which the basic award can be decreased, also not applicable

here, is where the award would have the effect of reducing amounts otherwise

distributable to any of the decedent's minor children. RCW 11.54.050(2)(b).

14

The second situation in which the basic award can be decreased *is* applicable here. It can be reduced where a decedent is survived by children who are not the children of the surviving spouse and the award would decrease amounts otherwise distributable to such children. RCW 11.54.050(2)(a). Whether to reduce the award in this situation is discretionary with the court. *Id.* In exercising its discretion, the court "shall consider" certain statutory factors. *Id.* Those factors are the needs of the claimant and the intentions of the decedent. *Id.*; RCW 11.54.040(2), (3).

Within the factors of the claimant's need and the decedent's intention, the court "shall consider, without limitation," subfactors identified in RCW 11.54.040(2) and (3). Among subfactors that the court "shall" consider in determining the "intentions of the decedent" are:

> (a) Provisions made for the claimant by the decedent under the terms of the decedent's will or otherwise;
>
> (b) Provisions made for third parties or other entities under the decedent's will or otherwise that would be affected by an increased award;
>
> (c) If the claimant is the surviving spouse or surviving domestic partner, the duration and status of the marriage or the state registered domestic partnership of the decedent to the claimant at the time of the decedent's death;
>
> (d) The effect of any award on the availability of any other resources or benefits to the claimant;
>
> (e) The size and nature of the decedent's estate; and
>
> (f) Oral or written statements made by the decedent that are otherwise admissible as evidence.

RCW 11.54.040(3).

15

In addition to the three situations in which the trial court can "decrease" the basic award to the surviving spouse, it can "divide" the basic award between the surviving spouse and a child of the decedent who is not a child of the surviving spouse if the child petitions for division. RCW 11.54.010(1). The child may petition for division only if the surviving spouse has petitioned for the basic award. *Garwood*, 109 Wn. App. at 817. In such a case, the court "may divide the award . . . as it deems appropriate." RCW 11.54.010(1).

Vaughn responded to John's TEDRA petition with a petition for division of the basic award. He has not explained what he believes his petition for division adds to the trial court's analysis, given that he is the only beneficiary under Marilyn's will. The trial court's discretion in "decreasing" the award to John is guided by nonexclusive statutory factors, so any argument for "dividing" it could also be an argument for "decreasing" it.

Since the basic award takes priority and causes other claims to abate, it necessarily interferes with the distribution provided by the decedent's will. That interference, alone, is not a reason to refuse a surviving spouse's request for the basic award. RCW 11.54.040(3) drives this home, stating that "[t]he fact that the decedent has named beneficiaries other than the claimant as recipients of the decedent's estate is not of itself adequate to evidence such an intent as would prevent the award of an amount in excess of that provided for in RCW 6.13.030(2) with respect to lands."

16

Chapter 11.54 RCW was adopted in 1997 as the last action of the Washington State Bar Association's Probate Law Task Force's six-year project to recommend updates to the state probate code. *See* FINAL S. B. REP. ON SUBSTITUTE S.B. 5110 at 1, 55th Leg., Reg. Sess. (Wash. 1997). Before present RCW 11.54.010 permitted a surviving spouse to petition for a "basic award" from a decedent's property, former chapter 11.52 RCW permitted the surviving spouse to petition for a similar award, referred to as an award of "homestead" or an award "in lieu of homestead." Former RCW 11.52.020 (1985) (homestead), former RCW 11.52.010 (1987) (award in lieu of homestead). Like the basic award under present law, the homestead or in lieu of homestead awards were measured by the amount of the homestead figure for lands under RCW 6.13.030(2). Like the basic award under present law, the homestead or in lieu of homestead award was absolute, subject to a few statutory circumstances in which the court could exercise discretion.

We agree with the only other published decision that has addressed the basic award available under chapter 11.54 RCW that the basic award serves the same purpose as the former homestead or in lieu of homestead award. *See Garwood*, 109 Wn. App. at 813 n.1 ("The Legislature . . . in RCW 11.54.010(1) seems to be giving . . . a homestead award."), *accord* MARK REUTLINGER, WASHINGTON LAW OF WILLS AND INTESTATE SUCCESSION at 249 n.54 (3d. ed. 2018) ("The spouse's award has been interpreted, however, as in essence the equivalent of the former probate homestead or award in lieu of

17

homestead, because its characteristics most closely match that award." (citing *Garwood*,

109 Wn. App. 813-14 & n.1)).

That the "basic award" is functionally the equivalent of the former homestead or

in lieu of homestead award is borne out by legislative history.  The final senate bill report

describes the changes to the probate code's family support provisions as

"consolidat[ing]" "[e]xisting statutory provisions regarding awards in lieu of homestead

and family allowance."  FINAL S.B. REP. *supra*, at 1-2.  The house bill report on

Substitute Senate Bill 5110 as passed even refers to the basic award under the proposed

legislation as an "award in lieu of homestead."  SUBSTITUTE H.B. REP. on SUBSTITUTE

S.B. 5110, at 3 (as passed House Apr. 8, 1997).  Correspondence from the bill file reveals

that no substantive change was intended to the nature and purpose of the family support

amounts.  In a letter explaining the proposed legislation, a representative of the Probate

Law Task Force stated that "[t]he chief substantive changes" to family support provisions

> are that the existing statutory provisions regarding the award in lieu of
> homestead and family allowance have been consolidated, that the court may
> have discretion to increase the amount of the award to a surviving spouse or
> children, and that limitations are placed on the time within which a claim
> for an award can be made if probate proceedings have commenced.

Letter from Mark W. Roberts to Interested Parties, re Washington State Bar Association

Probate Law Task Force Proposed Legislation (Dec. 3, 1996) (on file Wash. State

Archives).

Since the provisions of chapter 11.54 RCW parallel those of prior law, we may look to prior case law for guidance. This court did so in *Garwood*, citing *In re Estate of Crawford*, 107 Wn.2d 493, 502, 730 P.2d 675 (1986), for the proposition that "[t]he law favors awards in lieu of homestead as a matter of right for the protection of the surviving spouse and as a measure of fairness." *Garwood*, 109 Wn. App. at 814. Prior case law teaches that "the homestead award is strongly favored as a family protection device. It is based on what is perceived to be sound public policy, and thus it is given a 'high priority' and is liberally construed to effectuate that policy, in favor of granting the award wherever possible." MARK REUTLINGER AND WILLIAM C. OLTMAN, WASHINGTON LAW OF WILLS AND INTESTATE SUCCESSION at 234-35 (1985) (citing cases).

RCW 11.54.040(2) and (3) now specify factors and subfactors that must be considered in determining whether to decrease the basic award, including the intent of the decedent. *In re Boston's Estate*, 80 Wn.2d 70, 75, 491 P.2d 1033 (1971) teaches that the relevant intent of the decedent, while informed to an extent by the provisions of the decedent's will, is not dictated by those provisions. *Boston's Estate* dealt with Sadie and Henry Boston, who married late in life. Each had been married before, and each had accumulated substantial separate property. *Id.* at 71. They acquired little by way of community property after their marriage. On several occasions during the marriage, Henry told his stepchildren and others that any separate property of his and Sadie's was to be kept separate, and that upon his death, his separate property was to go to his son

19

(from a prior marriage) and that Sadie's separate property was to pass to her children. *Id.* at 74.

When Sadie died, she left her scant community property to Henry. She left her separate property to her two children. *Id.* at 71. Henry sought an award in lieu of homestead from her estate. *Id.* The children objected, and the trial court found that by his statements about his and Sadie's planned dispositions, Henry had waived his right to an award in lieu of homestead. *Id.* at 74-75.

The Supreme Court disagreed and reversed. *Id.* at 75-76. It held that the knowledge and intent that property has been left by will to someone else is not evidence of an understanding that a surviving spouse will not request or receive the priority award made available by statute. As the court explained:

> We have . . . noted that such allowances against the estate are preferred, just as other debts are preferred, and that as such a judicial duty is imposed which compels the setting aside of property. *In re Estate of Schiffner*, 174 Wash. 134, 24 P.2d 434 (1933). Absent the most clear and explicit language confirming a voluntary relinquishment of the award as a known right, a waiver will not be found. 92 C.J.S. *Waiver* p. 1041 (1955); *Reynolds v. Travelers Ins. Co.*, 176 Wash. 36, 28 P.2d 310 (1934). While we can conceive of a possible set of circumstances in which a waiver could be found without an express written document, such circumstances are not present here. *There is no evidence that appellant knew of the right to a homestead award, much less that he intentionally surrendered it. More consistent with the facts is the conclusion that the separate property of each was to be willed directly to their respective children, which was in fact done by Sadie Boston. Since the award in lieu of homestead is not affected thereby, there was no waiver.*

20

> . . . *[A]ppellant's statements concerning the passing of separate property are not inconsistent with a claim for an award in lieu of homestead.*

*Id.* at 75 (emphasis added).

At issue in this case is Marilyn's intent, not John's. But the same distinction between a dispositive plan in a will and an intent that a statutory family award be denied is presented. For Marilyn to execute a will leaving her property to Vaughn is different from intending that John be denied a priority award available by statute. The record contains no evidence that Marilyn knew of John's right to petition for a homestead-type award and wanted any such petition to be denied in its entirety. Clearly she loved Vaughn. Nonetheless, the trial court could find that if she had been aware of John's statutory right and the reasons for that right, then she might have agreed that the couple's 32 year marriage, including John's being at her side during her long battle with cancer, was a significant factor for the court to consider. The GAL, for one, perceived that Marilyn was concerned about both her son and her husband. Writing of her interview of Marilyn that took place 15 days before Marilyn's death, the GAL reported that at the end of the visit,

> Mrs. Hein looked at the GAL and said, firmly, "[W]hat am I going to do?" When I asked what she meant, she stated, "Vaughn and John?" She touched the GAL's shoulder and patted it while saying this. . . .
> . . . Mrs. Hein is very conflicted about this current situation. She feels caught between her husband and son who do not like each other at all and never have.

21

CP at 511-12.

It is for the trial court, not us, to exercise its broad discretion whether to decrease, divide or deny the basic award requested by John, but it must do so with the proper standard in mind. It must consider, without limitation, the factors and subfactors identified by RCW 11.54.040(2) and (3). John is not required to prove by clear and convincing evidence that the factors favor him. Because the trial court's denial of John's request for the basic award was based on an incorrect standard and burden of proof, its denial of that component of the award is reversed.

In addition to assigning error to the trial court's decision on John's petition for the basic award, John assigns error to the court allegedly denying him sufficient time to prepare and an adequate hearing. Our partial reversal and remand renders that assignment of error moot with respect to the basic award.

II.     The "increase" to the basic award authorized by RCW 11.54.040(1) serves the purpose of the former "family allowance" or "maintenance." The trial court's denial of an "increase" is supported by the evidence.

If a family award is made to a surviving spouse, it may be increased above the homestead exemption amount based on a showing of the surviving spouse's financial needs during pendency of the probate proceedings. RCW 11.54.040(1). It is only in connection with increasing the award beyond $125,000 that chapter 11.54 RCW requires a demonstration by "clear, cogent, and convincing evidence" that a surviving spouse's "present and reasonably anticipated future needs during the pendency of any probate

22

proceedings in the state of Washington with respect to basic maintenance and support will not otherwise be provided for from other resources." RCW 11.54.040.

Prior to the 1997 changes to the probate code, former chapter 11.52 RCW provided that a surviving spouse was entitled to petition for similar maintenance and support, referred to under prior law as a "family allowance" or "maintenance." The applicable provision, former RCW 11.52.040 (1965), said:

> In addition to the awards herein provided for, the court may make such further reasonable allowances of cash out of the estate as may be necessary for the maintenance of the family according to their circumstances, during the progress of the settlement of the estate, and any such allowance shall be paid by the personal representative in preference to all other charges, except funeral charges, expenses of last sickness and expenses of administration.

Under current law, the ability to petition for an "increase" to the basic award to meet the surviving spouse's "needs during the pendency of any probate proceedings" serves the same function as what was formerly called the family allowance or maintenance. RCW 11.54.040(1).

The trial court's letter ruling makes clear that in denying John's petition, it had in mind the standard and burden of proof for the RCW 11.54.040(1) increase in the basic award. John does not demonstrate on appeal that the trial court abused its discretion by refusing to afford him additional time or an adequate hearing on the requested increase. Additional time should not have been required for John to present evidence of his own present and reasonably anticipated future needs during the pendency of any probate. We

agree with the trial court that John did not present clear and convincing evidence of such a need. We affirm the trial court insofar as it denied John's request for an increase above the basic $125,000 award.

Vaughn requests attorney fees on appeal pursuant to TEDRA and RAP 18.1. The request is denied.

We affirm the trial court's denial of John's request that he receive, from Marilyn's property, an increase in the basic award as provided by RCW 11.54.040(1). We reverse its denial of John's petition for an award from Marilyn's property of the basic award provided by RCW 11.54.010 and .020. We remand for proceedings consistent with this opinion.

_____
Siddoway, J.

WE CONCUR:

_____
Pennell, C.J.

_____
Lawrence-Berrey, J.