# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

THE REPUBLIC OF KAZAKHSTAN, )
                      )
          Respondent, )
                      )
      v.                 )
                      )
DOES 1-100, inclusive,      )
                      )
          Defendants, )
                      )
LLC MEDIA-CONSULT,      )
                      )
          Appellant.      )

No. 73391-5-I

DIVISION ONE

PUBLISHED OPINION

FILED: February 22, 2016

TRICKEY, J. — The Republic of Kazakhstan initiated a California state court lawsuit against 100 unnamed "John Doe" defendants.[1] Kazakhstan alleged that these defendants hacked into Kazakhstan's government computer network and stole and published hundreds of privileged and confidential e-mails from high-ranking Kazakh officials in violation of California and United States law.

In connection with that lawsuit, Kazakhstan requested that the King County Superior Court issue a subpoena duces tecum to eNom, Inc., an Internet domain name registration company located in Kirkland, Washington. The subpoena seeks domain name registrant information and Internet Protocol (IP) and/or Mac addresses for a website operated by "Respublika," an opposition newspaper based in Kazakhstan that published several of the stolen e-mails.

On appeal, we must interpret Washington's news media shield law, RCW 5.68.010, and determine whether it protects the information sought by this

---

[1] Clerk's Papers (CP) at 50-57.

subpoena. The trial court concluded that the news media shield law did not apply, and it denied third-party LLC Media-Consult's (LMC) motion to quash subject to certain modifications. We disagree and therefore reverse.

FACTS

Appellant LMC is a Russian limited liability company that operates the online publication of Respublika. Irina Petrushova, Respublika's founder and editor-in-chief, owns LMC with her brother. Petrushova founded Respublika in 2000, and the newspaper has been published online since September 2008. Its main website is "www.respublika-kaz.info."[2]

Published weekly, Respublika principally covers business and politics in Kazakhstan, a country in central Asia. According to Petrushova, Respublika is "a forum for expressing opposition to the political regime in Kazakhstan."[3] It has consistently published articles critical of Kazakhstan's President Nursultan Nazarbayev. As a result, Petrushova asserts, Respublika's journalists have become targets of an aggressive intimidation campaign. In 2002, Petrushova left Kazakhstan in fear for her life.

Petrushova continues to run Respublika's editorial board and report on government corruption in Kazakhstan. Petrushova claims that the editorial team established various newspapers over the years, but the government shut down all of them. Printing houses in Kazakhstan refused to publish Respublika's newspapers, and the editorial team was forced to publish them on home printers and in Russia.

---

[2] CP at 77.
[3] CP at 78.

2

According to Petrushova, in 2010, the Kazakh government blocked access to Respublika's online portal. As a result, in order to access Respublika's news from Kazakhstan, Respublika's readers have to use proxy servers and other programs that can work around domestic blocking. In 2013, a Kazakh court closed websites associated with Respublika. In 2014, pressure on Respublika mounted in Russia when Russian authorities seized a server that hosted Respublika's website.

In early 2015, Kazakhstan claimed that it had discovered a major breach of its computer systems. According to Marat Beketayev, the Executive Secretary of the Ministry of Justice of the Republic of Kazakhstan, e-mail accounts of several high-ranking government officials were hacked and thousands of e-mails and documents were stolen and posted to various websites. Kazakhstan claims that these e-mails and documents contain confidential and privileged material, including communications between Kazakhstan and its legal advisers who were advising the government on various sensitive matters. A website hosted by WordPress, "https://kazaword.wordpress.com," published several of these stolen e-mails.[4] Respublika also published several of these e-mails, along with an article critical of the government.

Following these events, Kazakhstan commenced an action in Santa Clara, California superior court against 100 "John Doe" defendants, alleging violations of California and federal law.[5] Kazakhstan also commenced an action against the

---

[4] CP at 203; Report of Proceedings (RP) (Apr. 30, 2015) at 7, 12-13.
[5] CP at 50-57.

unnamed Does in the United States District Court for the Southern District of New York, seeking injunctive relief and damages.[6]

On March 4, 2015, Kazakhstan initiated this limited action in King County Superior Court. Pursuant to RCW 5.51.020, the uniform interstate depositions and discovery act, Kazakhstan sought to serve a subpoena duces tecum on eNom, Inc., a domain name registration company located in Kirkland, Washington. For several years, eNom, Inc. has registered the domain name for Respublika's main website: "www.respublika-kaz.info."[7] eNom, Inc. offers a domain privacy service called "ID Protect," which shields a domain name registrant's personal, identifying information.[8] Respublika uses eNom's privacy service to shield its current and former registrants' information.

The subpoena duces tecum requested certain information associated with Respublika's domain name. Defining "domain name" as "www.respublika-kaz.info," it requested that eNom produce the following two[9] categories of information:

> 1. Documents sufficient to show all details of all current and former registrants, including any underlying registrant using a privacy or proxy service, of the Domain Name including, but not limited to, his or her email address, physical address, phone number, and billing information, including any updated or revised details since registration.
>
> 2. Documents sufficient to show the dates, times and corresponding IP Addresses and/or Mac Addresses from which the Domain Name was registered, created or modified.[10]

---

[6] Br. of Appellant (LLC Media-Consult) at App. B.
[7] CP at 86, 88.
[8] CP at 34.
[9] Initially, Kazakhstan requested three additional categories of documents but it later withdrew these requests.
[10] CP at 10.

LMC, a nonparty, moved to quash the subpoena. LMC argued that the subpoena was oppressive and burdensome, violated Washington's news media shield law, and ran contrary to "core constitutional values."[11] It asserted that a protective order would be ineffective and unworkable and that the court could grant no effective relief short of quashing the subpoena.

LMC supported its motion with a declaration from Petrushova. Petrushova detailed threats against Respublika's members. For example, she asserted that one of Respublika's printers quit after finding a human skull on his doorstep. In other examples, Petrushova asserted that she received a funeral wreath that marked her for death, found a dog's headless body hung from one of Respublika's window grates with a threatening note, and found a dog's head outside her apartment door. She also asserted that Respublika's editorial board's office had been set on fire and that Respublika's newsroom had been firebombed.

In her declaration, Petrushova also stated several concerns about the consequences of disclosing information about Respublika's current and former domain name registrants. She declared that the current owner of the domain is an individual, not a company. She feared that the Kazakhstan government would bring unfounded civil and criminal claims against the domain name registrants and that the registrants would be at risk of physical danger, such as beating, kidnapping, and unlawful detention. She also worried that the financiers of the domain name would be persecuted and that the accounts would be frozen. And

---

[11] CP at 24.

5

she expressed concern about the effect of this disclosure on other opposition journalists:

> Disclosure of domain registration and hosting details, both current and former, would undoubtedly lead to enormous pressures on Respublika's current and past registrars and hosting providers. The disclosure would lead to requests to Respublika's registrars and hosting providers to cancel its domains and shut down its websites. If our main domain were cancelled or shut down, Respublika would lose a large part of the audience that has been visiting that domain since September 15, 2008. The precedent would also have a tremendous chilling effect on the freedom of the press for any remaining opposition journalists who are risking their lives to report on Kazakhstan.[12]

Along with her declaration, Petrushova included copies of newspaper articles detailing the political climate and media crackdown in Kazakhstan. She also included reports from human rights organizations that described Kazakhstan's restrictions on freedom of expression and classified Kazakhstan as one of the world's most repressive states.

Kazakhstan opposed the motion to quash. It argued that the news media shield law was inapplicable and that the subpoena was not burdensome or oppressive. In support of its position, Kazakhstan provided a declaration from Secretary Beketayev. He denied Petrushova's accusations that Kazakhstan targeted opposition journalists. He asserted that Petrushova and her husband were working for Mukhtar Ablyazov, a Kazakh national who has been found by an English court to have defrauded a Kazakh bank of $4.6 billion. Secretary Beketayev asserted that Petrushova and her husband were working on behalf of Ablyazov to propagate the distribution of the hacked e-mails and documents.

---

[12] CP at 89.

A hearing on LMC's motion to quash occurred on April 30, 2015. After hearing argument from the parties, the trial court concluded that the news media shield law was inapplicable. But the court decided to limit discovery in two ways. First, the court ruled that Kazakhstan could not obtain billing information, and it struck this category from the subpoena. Second, the court limited the produced records to "Attorneys' Eyes Only."[13] The trial court denied LMC's motion to quash the subpoena subject to these modifications. It entered an order stating as follows:

> [e]Nom shall produce the documents in categories 1 and 2 of the subpoena, with the exception of "billing information," by Monday, May 4, 2015. Categories 3, 4, [and] 5 are withdrawn by [Kazakhstan]. The produced records shall be for attorneys' eyes only.[14]

LMC appealed to this court. A commissioner of this court granted LMC's motion for an emergency stay of the trial court's order.

## ANALYSIS

We review a trial court's order granting or denying a motion to quash a subpoena for abuse of discretion. Eugster v. City of Spokane, 121 Wn. App. 799, 807, 91 P.3d 117 (2004). We also review a trial court's discovery order for an abuse of discretion. T.S. v. Boy Scouts of Am., 157 Wn.2d 416, 423, 138 P.3d 1053 (2006). A court abuses its discretion if its decision is manifestly unreasonable or exercised on untenable grounds or reasons. Eugster, 121 Wn. App. at 807.

A court shall quash a subpoena if it requires disclosure of privileged or other protected information and no exception or waiver applies. CR 45(c)(3)(A)(iii).

---

[13] RP (Apr. 30, 2015) at 30-31.
[14] CP at 412.

7

Washington News Media Shield Law

LMC argues that the trial court erred in its interpretation of Washington's news media shield law. It contends that this shield law applies to the parties and records sought in this case, because the purpose of the subpoena is to identify a confidential source. We agree.

In general, "[t]he burden of showing that a privilege applies in any given situation rests entirely upon the entity asserting the privilege." Guillen v. Pierce County, 144 Wn.2d 696, 716, 31 P.3d 628 (2001), reversed in part, Pierce County v. Guillen, 537 U.S. 129, 123 S. Ct. 720, 154 L. Ed. 2d 610 (2003). Accordingly, LMC has the burden of showing that the news media shield law applies.

No court has interpreted Washington's news media shield law. In determining the meaning and scope of a statute, we apply general principles of statutory construction. State v. Chester, 133 Wn.2d 15, 21, 940 P.2d 1374 (1997). Our primary purpose is to ascertain and effectuate the legislature's intent. Anderson v. Dussault, 181 Wn.2d 360, 368, 333 P.3d 395 (2014). We first examine the plain meaning of the statute. "When determining a statute's plain meaning, we consider 'the ordinary meaning of words, the basic rules of grammar, and the statutory context to conclude what the legislature has provided for in the statute and related statutes.'" Darkenwald v. Emp't Sec. Dep't, 183 Wn.2d 237, 245, 350 P.3d 647 (2015) (quoting In re Forfeiture of One 1970 Chevrolet Chevelle, 166 Wn.2d 834, 838-39, 215 P.3d 166 (2009)). If the meaning is plain on its face, we give effect to that plain meaning. If the statute is ambiguous, we may look to other aids of statutory construction, such as the legislative history, to determine

the legislature's intent. State v. A.G.S., 182 Wn.2d 273, 277-78, 340 P.3d 830 (2014). Statutory construction is an issue of law that we review de novo.

Washington's news media shield law has its origins in common law. The United States Supreme Court left it to individual states to determine how broadly to recognize a reporter's privilege. Branzburg v. Hayes, 408 U.S. 665, 706, 92 S. Ct. 2646, 33 L. Ed. 2d 626 (1972). In Washington, our courts first recognized the privilege in Senear v. Daily Journal-American, 97 Wn.2d 148, 641 P.2d 1180 (1982). There, the Supreme Court held that journalists have a qualified common law privilege with respect to their sources of information, but it confined the privilege to civil cases. Senear, 97 Wn.2d at 151, 155. Two years later, in State v. Rinaldo, 102 Wn.2d 749, 755, 689 P.2d 392 (1984), the Supreme Court extended the qualified common law privilege for journalists to criminal cases.

In 2007, the legislature codified this privilege in RCW 5.68.010. In doing so, it extended the privilege both to members of the news media and to nonnews media parties.

RCW 5.68.010(1) applies to the "news media."[15] Under subsection (1), no judicial, legislative, administrative, or other body may compel the news media to testify, produce, or otherwise disclose:

---

[15] The term "news media" is defined by the statute as follows:
   "(a) Any newspaper, magazine or other periodical, book publisher, news agency, wire service, radio or television station or network, cable or satellite station or network, or audio or audiovisual production company, or any entity that is in the regular business of news gathering and disseminating news or information to the public by any means, including, but not limited to, print, broadcast, photographic, mechanical, internet, or electronic distribution;
   (b) Any person who is or has been an employee, agent, or independent contractor of any entity listed in (a) of this subsection, who is or has been

(a) The identity of a source of any news or information or any information that would tend to identify the source where such source has a reasonable expectation of confidentiality; or

(b) Any news or information obtained or prepared by the news media in its capacity in gathering, receiving, or processing news or information for potential communication to the public, including, but not limited to, any notes, outtakes, photographs, video or sound tapes, film, or other data of whatever sort in any medium now known or hereafter devised. This does not include physical evidence of a crime.

RCW 5.68.010(2) provides that a court may compel disclosure of the news or information described in subsection (1)(b) under certain circumstances. Thus, as the legislature explained in its final bill report, the news media has an absolute privilege with respect to the information contained in subsection (1)(a), and it has a qualified privilege with respect to the information contained in subsection (1)(b). FINAL B. REP. on H.B. 1366, 60th Leg., Reg. Sess. (Wash. 2007).

Washington's news media shield law also contains a provision for nonnews media parties. That subsection is RCW 5.68.010(3). In relevant part, it states:

The protection from compelled disclosure contained in subsection (1) of this section also applies to any subpoena issued to, or other compulsory process against, a nonnews media party where such subpoena or process seeks records, information, or other communications relating to business transactions between such nonnews media party and the news media for the purpose of discovering the identity of a source or obtaining news or information described in subsection (1) of this section. . . .

---

engaged in bona fide news gathering for such entity, and who obtained or prepared the news or information that is sought while serving in that capacity; or
(c) Any parent, subsidiary, or affiliate of the entities listed in (a) or (b) of this subsection to the extent that the subpoena or other compulsory process seeks news or information described in subsection (1) of this section."
RCW 5.68.010(5)(a),(b),(c).

Here, Kazakhstan's subpoena seeks information from eNom, Inc., an Internet domain name registration company. The parties do not dispute that eNom is a nonnews media party, and thus, the relevant statutory provision is RCW 5.68.010(3).

The parties also do not dispute that the information and records sought in this case fall within the scope of RCW 5.68.010(3), that is, they are "records, information, or other communications relating to business transactions between such nonnews media party and the news media." Kazakhstan seeks:

1. Documents sufficient to show all details of all current and former registrants, including any underlying registrant using a privacy or proxy service, of the Domain Name including, but not limited to, his or her email address, physical address, phone number, and billing information,[16] including any updated or revised details since registration.

2. Documents sufficient to show the dates, times and corresponding IP Addresses and/or Mac Addresses from which the Domain Name was registered, created or modified.[17]

The heart of the dispute is whether this subpoena seeks these records and information "for the purpose of discovering the identity of a source or obtaining news or information described in subsection (1) of this section." RCW 5.68.010(3). Again, subsection (1) protects against disclosure of, among other things, "The identity of a source of any news or information or any information that would tend to identify the source where such source has a reasonable expectation of confidentiality." RCW 5.68.010(1)(a).

_____

[16] The trial court struck "billing information" from the subpoena. RP (Apr. 30, 2015) at 29.
[17] CP at 3.

As Kazakhstan stated in the trial court and on appeal, it seeks the documents in this subpoena for the purpose of identifying the individual who illegally hacked into the e-mail accounts and stole the confidential materials. Specifically, it seeks the IP and Mac addresses to cross-reference against IP addresses that accessed Kazakh government servers at the time of the alleged hacking. And it seeks the domain name registrants' identities because they "can help confirm who hacked into Kazakhstan's computers and stole privileged documents."[18]

Kazakhstan seeks to establish either that the registrants are the hackers, or that they have information that can lead to the hackers. Both purposes are prohibited by the shield law. By seeking to establish that the registrants are the hackers, Kazakhstan's purpose is to identify "a source of any news or information." RCW 5.68.010(1)(a). By seeking to establish a link to the hackers, Kazakhstan's purpose is to obtain information "that would tend to identify" a source of news or information. RCW 5.68.010(1)(a). Accordingly, this subpoena falls within the plain language of the statute.

Kazakhstan argues that in journalist parlance the word "source" is a term of art.[19] It cites several cases and technical definitions to support this argument, including one authority that defines "source" as a "[p]erson, record, document or event that provides the information for the story."[20] Relying on these definitions, Kazakhstan contends that for the news media shield law to apply, LMC must

---

[18] Br. of Resp't at 43.

[19] Br. of Resp't at 27.

[20] Br. of Resp't at 28 (citing The Wall Street Journal Glossary of Terms: Journalism, http://www.info.wsj.com/college/glossary.journalism.pdf).

establish that the registrant is the source that provided the stolen materials directly to Respublika's journalist, or that the registrant would tend to identify the source that provided the stolen materials directly to Respublika's journalist.

Kazakhstan further claims that LMC is unable to do this, given its statements that it obtained the e-mails from a public source—the WordPress website. In New York federal court, LMC filed a letter[21] stating that "Respublika found the documents the same way the rest of the world did—after 69 gigabytes of documents were anonymously posted to kazaword.wordpress.com."[22] LMC's attorney made similar representations to this court at oral argument for this appeal.

We decline to read the statute so narrowly. The plain language of RCW 5.68.010(1)(a) is very broad. It protects against disclosure of the identity of *a* source of *any* news or information. It also protects against the disclosure of any information that *would tend to identify* a source. By requesting registrant information and IP addresses for the purpose of discovering the identity of the hackers, Kazakhstan impermissibly seeks information that falls within the plain language of RCW 5.68.010(1)(a). Accordingly, LMC's statement that it obtained the stolen materials from a third-party website does not prevent it from invoking the news media shield law.

## CONCLUSION

We hold that the Washington news media shield law prevents disclosure of the information sought by this subpoena. The trial court abused its discretion when

---

[21] We previously granted Kazakhstan's motion to supplement the record with this additional evidence.

[22] Republic of Kazakhstan's Motion to Permit Additional Evidence on Review at Ex. A.

it denied LMC's motion to quash. In light of this conclusion, we need not address LMC's arguments that the discovery order should be reversed because Kazakhstan is engaging in improper claim splitting or because the subpoena violates the Washington Constitution. We also need not address LMC's arguments that the discovery order is burdensome and oppressive.

We reverse the denial of the motion to quash the subpoena and remand to the trial court to dismiss the action.

Trickey, J

WE CONCUR: