IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

| | | |
|---|---|---|
| In the Matter of the Estate of<br>ZORA P. PALERMINI,<br><br>                    Deceased.<br><br>GEORGE BRALY, Personal<br>Representative of the Estate of Zora P.<br>Palermini and Co-Trustee of the Zora P.<br>Palermini Revocable Living Trust,<br><br>                 Respondent,<br><br>          v.<br><br>DOMINIQUE JINHONG, individually,<br>and Co-Trustee of the Zora P.<br>Palermini Revocable Living Trust,<br><br>                 Appellant. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) | No. 82048-6-I<br><br>DIVISION ONE<br><br><br><br><br><br><br><br>UNPUBLISHED OPINION |

BOWMAN, J. — In the months before and after Zora "Polly"[1] Palermini's death, her granddaughter Dominque Jinhong misappropriated nearly all the assets in the estate of Zora P. Palermini (Estate) by falsifying documents, misrepresenting her authority, exerting undue influence over Polly as a vulnerable adult, and exploiting her fiduciary powers. The Estate successfully petitioned under the Trust and Estate Dispute Resolution Act (TEDRA), chapter 11.96A RCW, to recoup Polly's assets and disinherit Jinhong. Jinhong appeals,

_____

[1] We refer to Zora Palermini by her nickname "Polly" for clarity and intend no disrespect.

Citations and pin cites are based on the Westlaw online version of the cited material.

arguing the trial court committed a series of evidentiary errors and reached conclusions of law that sufficient facts do not support. We affirm.

FACTS

Polly planned for her death thoughtfully and carefully. As a widow with two disabled adult sons, Matthew "Matt" Palermini and Louis Daniel "Dan" Palermini,[2] Polly knew she would have to protect her assets for their long-term care.[3] Despite being "strong-willed" and "independent," Polly valued family and personal relationships. Though estranged from her daughter Jonnie, Polly maintained a relationship with one of Jonnie's daughters, Dominique Jinhong, a lawyer and administrative law judge.

Polly's paramount concern to provide for Matt and Dan's needs was clear to everyone she knew. She lived frugally and saved as much as possible. In 1991, Polly used estate planners to create and maintain the Zora P. Palermini Revocable Living Trust (Trust) for the benefit of her sons. Polly intended all of her assets to transfer to the Trust after her death. She also created a "pour-over will" that transferred any assets in her name into the Trust when she died.

In 2010, Polly began working with attorney and estate planner John Kenney to manage her Estate. Against Kenney's advice, Polly insisted on

---

[2] We also refer to Matthew Palermini and Louis Palermini by their nicknames "Matt" and "Dan" respectively for clarity.

[3] Polly also had two daughters. Lou Ann Palermini-Moser died in 2008. Polly explicitly disinherited her other daughter and Jinhong's mother, Jonnie Kay Shoenholz. We refer to Jonnie Shoenholz by her first name for clarity as well.

appointing a friend and Jinhong as co-fiduciaries that must agree unanimously to act because of "trust issues" with her family.[4]

In October 2016, Polly met with Kenney to make changes to her Estate plan. Polly replaced one of the co-trustees with her accountant George Braly, who she considered "very trustworthy."[5] She executed a "Certification of Trust," naming Jinhong and Braly as joint successor trustees if she died, became incapacitated, or otherwise initiated a transfer of Trust powers. Two Morgan Stanley accounts held the Trust funds with a combined value of $802,478.

Polly also removed Jinhong's sister from the list of contingent beneficiaries and split that portion between her neighbors' two sons. Polly kept Matt and Dan as the primary beneficiaries of the Trust and decided that if one of her sons died, his share would go to the other son. None of the contingent beneficiaries would inherit under the Trust unless both sons died. Polly's Estate plan also provided that Jinhong could buy Polly's house at 90 percent of its fair market value. Polly decided against gifting her house to Jinhong because she wanted the proceeds from the sale of the house to remain in the Trust for the benefit of Dan and Matt.

Kenney also prepared and notarized a 20-page "General Durable Power of Attorney" (DPOA) for Polly. The DPOA appointed Jinhong and Braly as co-agents to make decisions on Polly's behalf "by unanimous consent" only. According to Kenney, the DPOA would authorize Polly's co-agents to transfer property to her Trust, make withdrawals from her retirement assets, or "do

---

[4] Kenney spoke of general family trust issues but one of Polly's friends testified that Polly did not trust Jinhong specifically.

[5] Jinhong remained co-trustee.

anything else that you want your agents to do for you to take care of you in the event that you become unable to effectively manage your property or financial affairs." Polly could activate the DPOA by signing a "Certification of Authorization by Principal," which she kept, unsigned, for future use. When Kenney prepared the 2016 documents, he had a copy machine that could not produce color copies. He made a black and white copy of the documents and gave all the originals, except the will, to Polly in a three-ring binder.

Polly also maintained a KeyBank checking account that received "automatic direct deposits from [S]ocial [S]ecurity, [V]eterans[ ] [A]dministration, and civil service for the benefit of Polly, Matt and Dan." At the end of November 2017, the account had a balance of $181,081.

Polly became increasingly ill toward the end of 2017. She was 88 years old and suffered from congestive heart failure, among other conditions, and understood her condition was terminal. In December 2017, Polly was admitted to a long-term skilled nursing facility and Jinhong began taking an active role in Polly's affairs. Jinhong took Polly to KeyBank to designate herself as the "Payable on Death" beneficiary on the account so that she could "pay bills for the boys."

On December 2, 2017, Polly executed the single-page Certification of Authorization by Principal form prepared by Kenny in 2016, triggering the 2016 DPOA. But before Polly executed the authorization, Jinhong drafted a new DPOA, purportedly signed by Polly and notarized by Jinhong. The new document differed significantly from the original DPOA Kenney created for Polly.

4

It named Braly as a successor agent rather than a co-agent, giving Jinhong sole authority to manage Polly's affairs.

On December 13, 2017, Jinhong took control of Polly's KeyBank account by presenting the new DPOA to KeyBank officials. She attached the new DPOA to an altered version of the Certification of Authorization by Principal. The altered document did not match the original certificate in Polly's three-ring binder and completely omitted the "Certification of Authorization by Principal" heading.

Jinhong then tried to access Polly's Trust accounts, telling Morgan Stanley the money was needed "to fund Polly's long-term care." She made three attempts to access Polly's funds. First, she scanned and e-mailed Morgan Stanley the 2016 DPOA that Kenney drafted. But Morgan Stanley rejected the document as insufficient authorization to access Polly's accounts. Later that same day, Jinhong scanned and e-mailed the "updated" 2017 DPOA she drafted, naming herself as Polly's sole agent. Again, Morgan Stanley rejected the document as insufficient authorization to access Polly's accounts.

Three days later, Jinhong forged and e-mailed to Morgan Stanley a Certification of Trust that removed Polly as trustee and named herself sole trustee over Polly's accounts. The certification conflicted with other Trust documents identifying Braly and Jinhong as co-trustees and differed from the Certification of Trust that Kenney prepared in 2016 and kept in his files. While Jinhong's altered Certification of Trust bore Kenney's signature, he later testified he "would never" sign two different versions of the document. The forged document also showed physical signs that it was not created along with the other

5

Estate documents kept in Polly's three-ring binder. It did not have visible three-hole-punch shading and omitted certain words from Kenny's version. Forensic document examiners and handwriting experts hired by the Estate later concluded that the forged Certification of Trust contradicted the other Trust documents, contained altered signatures, and was created using a color-capable copy machine, which Kenney did not have in 2016. But unaware of the forgery, Morgan Stanley accepted the Certification of Trust as sufficient authority for Jinhong to access Polly's Trust accounts.

Jinhong then prepared and "convinc[ed]" Polly to sign a quit claim deed to Polly's house and a zero-interest promissory note, transferring ownership of the house from the Trust to Jinhong for $1 to be paid after Polly's scheduled date to end her life under the Washington Death with Dignity Act (DDA), chapter 70.245 RCW. On January 8, 2018, Jinhong recorded the house "as a gift."

Sadly, on January 9, Polly's son Dan died. Then, utilizing the DDA, Polly took her life on January 12, 2018 by self administering fatal medications. At the time of her death, Polly was under hospice care at the skilled nursing facility.

Records showed that between December 27, 2017 and January 31, 2018, Jinhong withdrew $91,433 from Polly's KeyBank account to pay her personal debt. She then liquidated Polly's Morgan Stanley accounts and moved the Trust funds into the KeyBank account, creating "the appearance to Morgan Stanley that the transfers were made for the benefit of Polly" and supporting Jinhong's "representations that the funds were for Polly's benefit." The transfer triggered capital gains taxes of more than $188,000. On January 31, 2018, Jinhong

withdrew $706,029 from Polly's KeyBank account as a cashier's check payable to herself. She used none of the funds to pay for Polly's medical care.

Jinhong presented the altered Certification of Trust to Braly and explained that she was now the sole trustee of Polly's Trust accounts. Braly contacted Kenney, who felt "[i]t was clear" that Jinhong gave Braly "false" documents. On May 10, 2018, Braly as personal representative (PR) of the Estate and co-trustee of the Trust petitioned under TEDRA to recover Polly's assets, remove Jinhong as trustee, and remove Jinhong as a beneficiary, alleging that Jinhong breached her fiduciary obligations. Jinhong responded that she was acting according to Polly's instructions under the "later" 2017 DPOA and authorized to manage Polly's assets.[6]

Jinhong moved for partial summary judgment, which the trial court denied. After a three-week bench trial, the court entered 26 pages of "Final Findings of Fact, Conclusions of Law, and Relief Ordered" in favor of the Estate, ruling that Jinhong committed fraud, breached her fiduciary duties by exerting undue influence to appropriate Trust assets, and financially exploited Polly as a vulnerable adult. The court "invalidated and voided" the quit claim deed and reverted Polly's real property back into the Trust. It also found Jinhong personally liable to the Estate for the funds she removed, including accrued interest, dividends earned, prejudgment interest, and the assessed capital gains

---

[6] Jinhong filed a creditor's claim for $71,474 on September 28, 2018, more than four months after Braly as PR filed the probate notice to creditors. The trial court later denied Jinhong's claim as untimely under chapter 11.40 RCW.

taxes. Finally, the court disinherited Jinhong as a beneficiary and ordered her to pay attorney fees and costs.

Jinhong appeals.

ANALYSIS

Summary Judgment

Jinhong contends the trial court erred in denying her motion for partial summary judgment as a matter of law but provides no argument in support of her assignment of error. In any event, "denial of summary judgment cannot be appealed following a trial if the denial was based upon a determination that material facts are in dispute and must be resolved by the trier of fact." Johnson v. Rothstein, 52 Wn. App. 303, 304, 759 P.2d 471 (1988). Instead, "the losing party must appeal from the sufficiency of the evidence presented at trial." Adcox v. Children's Orthopedic Hosp. & Med. Ctr., 123 Wn.2d 15, 35 n.9, 864 P.2d 921 (1993).

Here, the trial court denied Jinhong's motion for summary judgment because the parties disputed the authenticity of several Estate documents, the extent of Jinhong's authority to act under those documents, and when Polly's health deteriorated so that she became a vulnerable adult unable to care for herself. The court resolved the dispute over these material facts at trial. As a result, Jinhong cannot appeal the denial of her summary judgment motion.

Evidentiary Rulings

Jinhong contends the trial court abused its discretion in making several evidentiary rulings. She claims the court erred in applying the deadman's statute, excluding testimony under the hearsay rule, and denying her motion to exclude testimony protected by spousal privilege.

A.  Deadman's Statute

Jinhong argues the trial court misapplied RCW 5.60.030, often called the "deadman's statute" (DMS), unduly restricting her presentation of evidence.  She contends the Estate waived its protections under the DMS, the trial court improperly denied Jinhong the ability to testify about certain transactions with Polly, and the trial court erroneously excluded admissions made by Matt during discovery.

The DMS "prevent[s] interested parties from giving self-serving testimony about conversations or transactions with the deceased, because the deceased is not available to rebut such testimony."  Rabb v. Estate of McDermott, 60 Wn. App. 334, 339, 803 P.2d 819 (1991).  Under RCW 5.60.030, in a lawsuit enforcing or contesting a deceased person's estate,

> a party in interest or to the record, shall not be admitted to testify in his or her own behalf as to any transaction had by him or her with, or any statement made to him or her, or in his or her presence, by any such deceased . . . person.

We review evidentiary rulings under the DMS for abuse of discretion.  City of Spokane v. Neff, 152 Wn.2d 85, 91, 93 P.3d 158 (2004).  A court abuses its discretion if its decision is manifestly unreasonable or exercised on untenable grounds or reasons.  Republic of Kazakhstan v. Does 1-100, 192 Wn. App. 773,

9

781, 368 P.3d 524 (2016).  But the trial court's determination of whether a witness is a party in interest or whether an event is a "transaction" under the DMS is a legal question that we review de novo.  See Eugster v. City of Spokane, 139 Wn. App. 21, 31, 156 P.3d 912 (2007) ("Whether a statute applies to a particular set of facts is a question of law that we review de novo.").

An interested party is one who stands to either gain or lose as a direct result of the judgment.  Rabb, 60 Wn. App. at 340 (citing 5A KARL B. TEGLAND, WASHINGTON PRACTICE:  EVIDENCE § 213 (1989)).  We define a "transaction" by "whether [the] deceased, if living, could contradict the witness of his own knowledge."  In re Wind's Estate, 27 Wn. 2d 421, 426, 178 P.2d 731 (1947).  "[T]o constitute a transaction, the testimony must indicate that the decedent was both present and directly involved in the matter at hand."  In re Estate of Lennon, 108 Wn. App. 167, 178, 29 P.3d 1258 (2001).  The DMS "precludes not only positive assertions that a transaction or conversation with the decedent took place, but also testimony of a 'negative' character denying interactions with the decedent."  Botka v. Estate of Hoerr, 105 Wn. App. 974, 980, 21 P.3d 723 (2001) (quoting Martin v. Shaen, 26 Wn.2d 346, 352-53, 173 P.2d 968 (1946)).

The DMS does not bar the admission of documents.  Laue v. Estate of Elder, 106 Wn. App. 699, 706, 25 P.3d 1032 (2001) (citing Thor v. McDearmid, 63 Wn. App. 193, 202, 817 P.2d 1380 (1991)).  Nor does it prevent an interested party from testifying about his or her own feelings or impressions, unless those impressions necessarily imply a transaction with the decedent.  Lennon, 108 Wn.

App. at 175; Thor, 63 Wn. App. at 200-01 (citing Spencer v. Terrel, 17 Wash. 514, 519, 50 P. 468 (1897)).

### 1. Waiver

Jinhong argues the Estate waived application of the DMS by calling and questioning witnesses at trial. We disagree.

The protected party—here, the Estate—can waive the DMS by introducing evidence about a protected transaction with the deceased. Lennon, 108 Wn. App. at 175. A party can also waive the statutory protections by failing to object to an adverse party's testimony about protected transactions with the deceased or by cross examining an adverse party about protected transactions and conversations with the deceased that the adverse party did not testify to on direct examination. McGugart v. Brumback, 77 Wn.2d 441, 450-51, 463 P.2d 140 (1969). Once the protected party has "opened the door," the interested party is entitled to rebuttal. Lennon, 108 Wn. App. at 175. A waiver by introduction of testimony about one transaction does not extend to unrelated transactions and conversations. Bentzen v. Demmons, 68 Wn. App. 339, 345, 842 P.2d 1015 (1993).

Jinhong first alleges the Estate waived application of the DMS because Braly, the Estate's PR, described Polly's instructions to him about distribution of her assets in the Estate's TEDRA petition and as a witness at trial and asserted Polly "never reported the creation of the 2017 Durable Power of Attorney" to him. Citing In re Tate's Estate, 32 Wn.2d 252, 254, 201 P.2d 182 (1948), Jinhong argues that "[p]ersonal representatives of an estate are subject to the [DMS],

11

even when testifying in a representative capacity in support of the estate." But Jinhong ignores that this is true only when the PR is also an interested party.

> The test of the competency of a witness to testify as to conversations and transactions had with the deceased in a will contest case is whether [the PR] would gain or lose by a decree sustaining or revoking a will already admitted to probate.

Tate's Estate, 32 Wn.2d at 254. Where the PR's interest is apparent, the evidence is inadmissible, "even though [the witness testified] in court in a representative capacity." Tate's Estate, 32 Wn.2d at 254.[7] Here, Braly was not a person "in interest" to the litigation because he stood to neither gain nor lose from the distribution of Polly's Estate. RCW 5.60.030. As a result, the DMS did not restrain him from testifying about his conversations with Polly about her assets and Estate plans or that Polly never mentioned the creation of a 2017 DPOA.

Similarly, Jinhong contends the Estate waived protection under the DMS by calling several witnesses who testified that "Polly told them she did not trust [Jinhong] and insinuated that [Jinhong] exerted some improper influence over the house." Jinhong cites Botka in support of her argument. In Botka, a hospice nurse fell down an elevator shaft at the decedent's home and sued the homeowner's estate for damages. Botka, 105 Wn. App. at 976. The estate claimed the nurse was a trespasser and the DMS barred her testimony. The decedent's daughter testified and suggested that the decedent was unaware the

---

[7] Jinhong also cites In re Estate of Shaughnessy, 97 Wn.2d 652, 656, 648 P.2d 427 (1982), aff'd, 104 Wn.2d 89, 702 P.2d 132 (1985), in support of her claim that Braly's testimony waived application of the DMS. But that case also concludes the DMS prohibits an interested party from testifying about transactions with the deceased, even if "he is testifying in favor of the will and thus in favor of the estate and is doing so in a representative capacity." Shaughnessy, 97 Wn.2d at 656.

nurse would be at his home that day. Botka, 105 Wn. App. at 977, 980. We concluded the estate waived protection under the DMS by eliciting testimony from the daughter "of a 'negative' character denying interactions" between the decedent and a party interested in the outcome of the trial—the nurse. Botka, 105 Wn. App. at 980-81.

Here, the Estate presented testimony from Polly's longtime friends and neighbors that Polly told them she intended all her assets be used to provide for her sons' needs and that she did not trust Jinhong. None of the witnesses were interested parties to Polly's Estate, so the DMS did not bar testimony about their conversations with Polly. And unlike Botka, none of the Estate's witnesses testified about protected transactions between Polly and Jinhong.

Jinhong next contends that the Estate waived protection under the DMS because when a party "calls an interested party as an adverse witness, the statute's protections are presumptively waived." Jinhong cites Johnson v. Peterson, 43 Wn.2d 816, 818, 264 P.2d 237 (1953); Zvolis v. Condos, 56 Wn.2d 275, 352 P.2d 809 (1960); and Lennon, 108 Wn. App. at 175, in support of her sweeping claim. None of the cases cited by Jinhong support her argument. Rather, these cases find waiver of the DMS only when the protected party examines an adverse witness about otherwise barred transactions involving the decedent.

Jinhong argues the Estate "questioned her extensively" about otherwise barred transactions, including "specific transactions that were the heart of the matters at issue." Jinhong points to the Estate's questions on direct about which

section of the DPOA Jinhong "believed" authorized her to access Polly's Trust funds, whether Jinhong "was aware of" the representations and warranties she made by signing a fiduciary agreement and Trust account agreement, asking Jinhong to "identify" personal bills she paid from Polly's account, and asking Jinhong "where she was" when making a specific banking transaction. But these questions sought information only about Jinhong's own actions and state of mind. See Thor, 63 Wn. App. at 201; Lennon, 108 Wn. App. at 175. As such, the DMS did not bar the questions and the questions did not serve to waive DMS protections.

### 2. Testimony

Jinhong argues the trial court "fundamentally misapplied the [DMS], excluding a host of responses, statements, and testimony that are simply not subject to the rule." Specifically, Jinhong asserts the court precluded her from testifying that she lived with Polly as a child and that the two always had a "close and loving relationship," would not let Jinhong give her impressions of Polly's relationship with Matt and Dan, and did not let Jinhong identify where Polly habitually kept notes about her final wishes.[8] But even if we accept Jinhong's argument that the trial court "misapplied" the DMS, she does not explain how the omission of her testimony was prejudicial given the overwhelming evidence that she forged documents and misrepresented her authority to secure assets from

---

[8] Jinhong also argues that the court did not permit her to testify about whether she would get a portion of the Estate in exchange for caring for Matt. But the court allowed Jinhong to testify that "[i]t was al[ ]ways my impression that if Dan were to die, that Dan's portion of the estate would come to me in exchange for taking care of Matt for the rest of his days."

Polly's Estate for her personal benefit. Error that does not "affect a substantial right . . . does not warrant reversal." Thor, 63 Wn App. at 202 (citing ER 103(a)).

### 3. Discovery

Jinhong claims the trial court erred in excluding formal admissions made by Matt during discovery as protected under the DMS.[9] We disagree.

In response to Jinhong's request for admissions (RFA), Matt admitted to hearing several statements from Polly about her intent to pay Jinhong's debts, her desire that Jinhong acquire her house, and her plan to pay Jinhong back for buying Dan a car.[10] Jinhong argues the DMS did not bar Matt's admissions because they were against his pecuniary interest as a Trust beneficiary. See In re Estate of Miller, 134 Wn. App. 885, 894, 143 P.3d 315 (2006) (testimony by party in interest not barred by DMS if the testimony is not self serving).

While it is true that Matt admitted Polly "mentioned in a telephone conversation at the end of December . . . 2017 that she was going to pay off Jinhong's campaign loans," Polly's statement went against Matt's pecuniary interest only if she intended the payment as a gift from the Estate. But as part of

---

[9] Jinhong also argues Matt waived application of the DMS by responding to Jinhong's request for admissions about his transactions with Polly. But engaging in pretrial discovery does not waive the DMS unless the court admits the discovery as evidence. See Botka, 105 Wn. App. at 981-82. " '[N]o useful purpose would be served by requiring a party entitled to the protection of RCW 5.60.030 to preserve that protection by resisting discovery until a court order commanded compliance.' " Botka, 105 Wn. App. at 982 (quoting Diel v. Beekman, 7 Wn. App. 139, 155, 499 P.2d 37 (1972)).

[10] We also note that in his response to the RFA, Matt first asserted "general objections" to the requests asking whether "he was aware of certain facts and asking for intent of decedent" because the "awareness and intent admissions lack any evidentiary foundation." Without waiving the objections, Matt agreed to "answer those [RFA] which do not establish appropriate foundation."

the same admission, Matt specifically denied Polly "intended to voluntarily pay off [Jinhong's] campaign loans as a gift."

Similarly, Matt admitted that "during a telephone conversation at the end of December, 2017, [Polly] told me that she wanted [Jinhong] to 'have the house.' " But again, the statement is against Matt's pecuniary interest only if Polly intended to gift Jinhong the house, which he denied and stated Polly never used the word "gift."

Finally, Matt admitted Polly "requested that [Jinhong] purchase a vehicle" for Dan and "intended to reimburse [Jinhong] for purchasing the vehicle." This admission is relevant to only Jinhong's creditor claim, which the court barred as untimely. The trial court did not abuse its discretion in excluding Matt's admissions under the DMS.[11]

B. Hearsay

Jinhong next claims the trial court erred in excluding as hearsay Polly's inquiry about a funds transfer from her Morgan Stanley account.

We review de novo whether a statement is hearsay but review for abuse of discretion a trial court's decision on applying a hearsay exception. State v. Edwards, 131 Wn. App. 611, 614, 128 P.3d 631 (2006); State v. Woods, 143 Wn.2d 561, 595, 23 P.3d 1046 (2001). A trial court abuses its discretion when its decision is manifestly unreasonable or based upon untenable grounds. Saldivar

---

[11] Jinhong claims the court erred in also excluding Matt's admission that Polly "had a very close relationship with [Jinhong] since [she] was a child." We are not convinced this testimony amounts to a "transaction" under the DMS. Even so, any error does not warrant reversal. See Thor, 63 Wn App. at 202 (citing ER 103(a)).

v. Momah, 145 Wn. App. 365, 394, 186 P.3d 1117 (2008) (citing Mayer v. Sto Indus., Inc., 156 Wn.2d 677, 684, 132 P.3d 115 (2006)). " '[E]videntiary error is grounds for reversal only if it results in prejudice.' " Bengtsson v. Sunnyworld Int'l, Inc., 14 Wn. App. 2d 91, 99, 469 P.3d 339 (2020) (quoting City of Seattle v. Pearson, 192 Wn. App. 802, 817, 369 P.3d 194 (2016)).

"Hearsay" is a statement, other than one made by the declarant while testifying, offered to prove the truth of the matter asserted. ER 801(c). A "statement" is "(1) an oral or written assertion or (2) nonverbal conduct of a person, if it is intended by the person as an assertion." ER 801(a). Whether a statement is hearsay depends on the purpose for which the statement is offered. State v. Crowder, 103 Wn. App. 20, 26, 11 P.3d 828 (2000). Evidence must also be relevant. ER 402. Evidence is relevant if it tends to prove or disprove some fact and is of consequence to the ultimate outcome of the case. Bengtsson, 14 Wn. App. 2d at 105 (citing Davidson v. Mun. of Metro. Seattle, 43 Wn. App. 569, 573, 719 P.2d 569 (1986)).

Jinhong identifies two utterances by Polly that she claims the court wrongfully excluded as hearsay. Jinhong's current spouse, Dr. Maureen Smith, offered testimony that a day or two before Polly died, she "knew there was a transfer from Morgan Stanley occurring" and overheard Jinhong talking to Polly on speakerphone. According to Dr. Smith, "Polly asked [Jinhong] if 'the transfer went through.' " She heard Jinhong "confirm[ ] that the funds had been transferred" and Polly say, " '[G]ood.' " We agree with Jinhong that Polly's question about whether "the transfer went through" was not hearsay. See State

17

v. Collins, 76 Wn. App. 496, 498, 886 P.2d 243 (1995) ("because an inquiry is not assertive, it is not a 'statement' as defined by the hearsay rule and cannot be hearsay"). But Polly's reply "good" was an assertion excludable as hearsay.

Jinhong argues the state of mind exception to hearsay applied to Polly's response because Polly's state of mind was at issue.[12] Even so, Polly's understanding of the transaction was relevant only if Polly was approving the unidentified money transfer as a gift to Jinhong. And the record is silent on what Polly believed was the purpose of the transfer. Excluding Polly's question and response was not prejudicial error.[13]

### C. Spousal Immunity

Jinhong claims the trial court erred when it concluded the spousal privilege did not preclude Jinhong's ex-wife, Kelly Montgomery, from testifying about statements Jinhong made during their marriage. The Estate asserts the court did not err because Jinhong and Montgomery were "never legally married."

The confidential communications privilege protects intimate exchanges among spouses and is intended to encourage the "free interchange of confidences that is necessary for mutual understanding and trust." State v.

---

[12] The state of mind exception in ER 803(a)(3) allows a "statement of the declarant's then existing state of mind, emotion, sensation, or physical condition (such as intent, plan, motive, design, mental feeling, pain, and bodily health)."

[13] Jinhong also argues the court should have admitted a diary she created documenting services she performed for Polly's benefit under the business record exception to hearsay. ER 803(a)(6)(i); RCW 5.45.020. But Jinhong makes no argument in her brief about how the diary would satisfy the elements of the business record exception. "Passing treatment of an issue or lack of reasoned argument is insufficient to merit judicial consideration." Holland v. City of Tacoma, 90 Wn. App. 533, 538, 954 P.2d 290 (1998).

Thorne, 43 Wn.2d 47, 55, 260 P.2d 331 (1953). RCW 5.60.060(1) states, in relevant part:

> A spouse or domestic partner shall not be examined for or against his or her spouse or domestic partner, without the consent of the spouse or domestic partner; nor can either during marriage or during the domestic partnership or afterward, be without the consent of the other, examined as to any communication made by one to the other during the marriage or the domestic partnership.

The confidential communications privilege "survives death or divorce"[14] and applies to all " 'actually successful' " confidential communications made between spouses while married. Barbee, 126 Wn. App. at 156 (quoting Swearingen v. Vik, 51 Wn.2d 843, 848, 322 P.2d 876 (1958)).

Jinhong and Montgomery were married in the state of Oregon in 2004. In 2005, the Oregon Supreme Court decided Li v. Oregon, 338 Or. 376, 110 P.3d 91, voiding marriage licenses issued to same-sex couples in Multnomah County, Oregon. In 2015, the United States Supreme Court decided Obergefell v. Hodges, 576 U.S. 644, 135 S. Ct. 2584, 192 L. Ed. 2d 609, abrogating Li and holding that same-sex couples have a fundamental right to marry that states must recognize. Jinhong argues the trial court "erred in determining that Li invalidated [her] marriage, where Li itself violated [her] fundamental, constitutional rights and was void ab initio."

Even assuming the court should have excluded Montgomery's testimony under the spousal privilege, it did not amount to prejudicial error. Montgomery testified that Polly's "will was a constant thing" she heard Jinhong discuss with

---

[14] Unlike the testimonial spousal privilege, which is "lost by divorce." Barbee v. Luong Firm, PLLC, 126 Wn. App. 148, 158-59, 107 P.3d 762 (2005).

19

her siblings, that Jinhong wanted Polly's car, and that Polly's house "was a big deal to [Jinhong]." The court properly admitted this same information through several other sources, including Polly's handwritten notes. Admitting Montgomery's testimony was not prejudicial error.

Sufficiency of Evidence

Jinhong argues insufficient evidence supports several of the trial court's conclusions of law following the bench trial. We reject her claims.

After a bench trial, our review is limited to whether substantial evidence supports a trial court's findings of fact[15] and whether those findings support the conclusions of law. Endicott v. Saul, 142 Wn. App. 899, 909, 176 P.3d 560 (2008). In evaluating the sufficiency of the evidence, we view all reasonable inferences in the light most favorable to the prevailing party. Jensen v. Lake Jane Estates, 165 Wn. App. 100, 104, 267 P.3d 435 (2011). We do not review the trial court's credibility determinations or weigh conflicting evidence. Quinn v. Cherry Lane Auto Plaza, Inc., 153 Wn. App. 710, 717, 225 P.3d 266 (2009). We review a trial court's conclusions of law de novo. Casterline v. Roberts, 168 Wn. App. 376, 381, 284 P.3d 743 (2012).

---

[15] Jinhong assigns error to several findings of fact but makes no attempt to show that substantial evidence does not support the findings. "It is incumbent on counsel to present the court with argument as to why specific findings of the trial court are not supported by the evidence and to cite to the record to support that argument." In re Estate of Lint, 135 Wn.2d 518, 532, 957 P.2d 755 (1998). Because Jinhong does not support her challenges to the court's findings with argument, we treat the findings as verities on appeal. Karlberg v. Otten, 167 Wn. App. 522, 525 n.1, 280 P.3d 1123 (2012).

A. Undue Influence

Jinhong contends sufficient evidence does not support the trial court's conclusion that she exerted undue influence over Polly. We disagree.

" 'Undue influence involves unfair persuasion that seriously impairs the free and competent exercise of judgment.' " Kitsap Bank v. Denley, 177 Wn. App. 559, 570, 312 P.3d 711 (2013) (quoting In re Estate of Jones, 170 Wn. App. 594, 606, 287 P.3d 610 (2012)). The determination of undue influence is a mixed question of fact and law. Kitsap Bank, 177 Wn. App. at 569 (citing In re Trust & Estate of Melter, 167 Wn. App. 285, 300, 273 P.3d 991 (2012)). Generally, the party seeking to set aside an inter vivos gift has the burden to show that the gift is a product of undue influence. Melter, 167 Wn. App. at 296. But where the recipient has a confidential or fiduciary relationship with the donor, the burden of persuasion shifts to the recipient to prove that the gift did not result from undue influence.[16] Melter, 167 Wn. App. at 296.

When, as here, a fiduciary relationship exists, the recipient must show that the gift " 'was made freely, voluntarily, and with a full understanding of the facts.' " Melter, 167 Wn. App. at 296[17] (quoting McCutcheon v. Brownfield, 2 Wn. App. 348, 356, 467 P.2d 868 (1970)). The burden of persuasion is clear, cogent, and convincing evidence. Melter, 167 Wn. App. at 296-97. The clear, cogent, and convincing standard requires evidence that the fact in issue is " 'highly

---

[16] Jinhong admits she acted as Polly's fiduciary.

[17] Internal quotation marks omitted.

probable.' " In re Estate of Haviland, 162 Wn. App. 548, 558, 255 P.3d 854 (2011)[18] (quoting Endicott, 142 Wn. App. at 910).

Jinhong argues that she satisfied her burden to show that Polly freely, voluntarily, and with full knowledge of the facts gifted her nearly all of the assets in the Estate. She points to testimony of physicians and caregivers who attested to Polly's competence to make decisions under the DDA. But " '[e]vidence of testamentary capacity is not inconsistent with the conclusion that undue influence had overmastered free agency.' " Haviland, 162 Wn. App. at 567 (quoting In re Estate of Esala, 16 Wn. App. 764, 770, 559 P.2d 592 (1977)). And the record shows that the trial court weighed the physician and caregiver testimony against other expert testimony expressing "significant concerns" as to Polly's "vulnerability," the evidence that Polly intended to leave the bulk of her Estate to ensure care for her sons, and the lack of evidence that Polly read and understood documents she purportedly signed while in hospice care. Sufficient evidence supports the trial court's conclusion that Jinhong breached her fiduciary duty by exerting undue influence over Polly.

B. Fraud

Jinhong contends sufficient evidence does not support the trial court's conclusion that she took assets from Polly by fraud. She argues evidence that she falsified the Certification of Trust and presented the forged document to Morgan Stanley did not amount to fraud because the Estate did not prove she

---

[18] Internal quotation marks omitted.

knew the document was false or that Morgan Stanley would rely on it.  We disagree.

A party must prove fraud by clear and convincing evidence.  <u>Bang D. Nguyen v. Wash. Dep't of Health Med. Quality Assur. Comm'n</u>, 144 Wn.2d 516, 527, 29 P.3d 689 (2001), <u>cert. denied</u>, 535 U.S. 904, 122 S. Ct. 1203, 152 L. Ed. 2d 141 (2002).  The well established elements of fraud are:

> (1) A representation of an existing fact; (2) its materiality; (3) its falsity; (4) the speaker's knowledge of its falsity or ignorance of its truth; (5) his [or her] intent that it should be acted on by the person to whom it is made; (6) ignorance of its falsity on the part of the person to whom it is made; (7) the latter's reliance on the truth of the representation; (8) his [or her] right to rely upon it; [and] (9) his [or her] consequent damage.

<u>Kirkham v. Smith</u>, 106 Wn. App. 177, 183, 23 P.3d 10 (2001).

The trial court found that Jinhong forged a fraudulent Certification of Trust and DPOA to gain access to Polly's Trust accounts.  Jinhong used the forged documents to hold herself out as Polly's sole agent and trustee.  Based on her misrepresentation,[19] Jinhong gained access to Polly's Trust accounts and liquidated them for her personal benefit.  These findings support the trial court's conclusion that Jinhong took assets from Polly by fraud.

C.  Slayer Statute

Jinhong claims the Estate did not show she financially exploited a vulnerable adult "serious enough" to disinherit her under RCW 11.84.020, commonly known as the "slayer statute."

---

[19] Having reviewed Polly's three-ring binder of Estate documents prepared by Kenney, Jinhong knew the documents she created did not accurately represent Polly's Estate plan.

23

The slayer statute provides that "[n]o slayer or abuser shall in any way acquire any property or receive any benefit as the result of the death of the decedent." An "abuser" is "any person who participates, either as a principal or an accessory before the fact, in the willful and unlawful financial exploitation of a vulnerable adult." RCW 11.84.010(1). The party seeking the benefit of the statute bears the burden of proof by a preponderance of the evidence. Cook v. Gisler, 20 Wn. App. 677, 683, 582 P.2d 550 (1978); In re Estate of Kissinger, 166 Wn.2d 120, 128, 206 P.3d 665 (2009) (citing Leavy, Taber, Schultz & Bergdahl v. Metro. Life Ins. Co., 20 Wn. App. 503, 507, 581 P.2d 167 (1978)).

In concluding that Jinhong exploited Polly, the trial court found that Polly was a vulnerable adult under RCW 74.34.020(22)(a) because she was over the age of 60 and unable to care for herself. The court also found that Jinhong illegally and improperly used or withheld Polly's property, resources, and Trust funds and made material misrepresentations to usurp the financial assets of the Trust for her personal gain. Finally, the trial court found that Jinhong financially exploited Polly by transferring Polly's house to herself as a gift and taking the bulk of the Estate for her personal use. The trial court's findings support its conclusion that Jinhong financially exploited Polly and the court properly disinherited her under the slayer statute.

Creditor Claim

Jinhong argues she "paid for several items out of her own pocket at Polly's request" and the trial court "erred in refusing to offset its award with amounts

owed to [her] from Polly's estate." The Estate claims Jinhong did not timely assert a creditor claim, waiving her ability to collect. We agree with the Estate.

We review issues of statutory interpretation de novo. In re Estate of Rathbone, 190 Wn.2d 332, 338, 412 P.3d 1283 (2018) (citing Anderson v. Dussault, 181 Wn.2d 360, 368, 333 P.3d 395 (2014)). Under the probate statute, a person having a claim against the decedent "is forever barred from making a claim or commencing an action against the decedent" unless she presents the claim within 30 days of receiving proper notice. RCW 11.40.051(1)(a)(i).

Jinhong agrees she did not timely file a claim under the probate statute. Even so, she asserts the trial court had "basic, equitable authority" under TEDRA to offset her recovery so that the Trust was not "unjustly enriched." The provisions of TEDRA "shall not supersede, but shall supplement, any otherwise applicable provisions and procedures" contained in chapter 11.40 RCW. RCW 11.96A.080(2). Because TEDRA does not supersede the probate statute's time limits, the trial court did not err in denying Jinhong's untimely creditor claim.

Attorney Fees

Jinhong asks us to reverse the trial court's award of attorney fees in favor of the Estate and to award her fees on appeal "[s]hould this Court reverse." Because we affirm the trial court's judgment, her request is moot.

The Estate also requests an award of fees on appeal. Under RCW 11.96A.150(1), we may exercise our discretion to award reasonable attorney fees to any party. In exercising our discretion, we may consider "any and all factors" that we deem "relevant and appropriate." RCW 11.96A.150(1). We

grant the Estate's request for reasonable attorney fees upon compliance with RAP 18.1.

Because Jinhong does not show prejudicial error and the trial court's findings support its conclusions of law, we affirm.

_____
Bumann, J.

WE CONCUR:

_____          _____
Coburn, J.                                                         Chun, J.